Matthew S. Parmet
CA State Bar No. 296742
PARMET, PC
440 N. Barranca Ave., No. 1228
Covina, California 91723
Telephone: (310) 928-1277

Annie McAdams, *pro hac vice*
ANNIE MCADAMS PC
1150 Bissonnet
Houston, Texas 77005
Telephone: (713) 785-6262

David E. Harris, *pro hac vice*
SICO HOELSCHER HARRIS, LLP
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
Telephone: (361) 653-3300

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | | |
|---|---|---|
| JANE DOE (K.B.), | § | Case No.: 23-CV-02387-JST |
| | § | |
| Plaintiff, | § | **PLAINTIFF'S OPPOSITION TO** |
| | § | **META PLATFORMS, INC.'S** |
| v. | § | **MOTION FOR JUDGMENT** |
| | § | **ON THE PLEADINGS** |
| | § | |
| | § | Date:  February 1, 2024 |
| BACKPAGE.COM, LLC; et al. | § | Time:  2:00pm |
| | § | Place: Videoconference |
| Defendants. | § | Judge: Hon. Jon S. Tigar |

## **TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ................................................................................ ii

STATEMENT OF THE ISSUES ........................................................................2

STATEMENT OF FACTS .................................................................................2

LEGAL STANDARD.........................................................................................3

ARGUMENT ......................................................................................................4

I.      Jane Doe's Sex-Trafficking Claim Against Facebook Is Not Barred By Section
        230 Because The Claim Does Not Treat Facebook As A "Publisher Or Speaker"
        Of Third-Party Content. ........................................................................4

II.     Jane Doe Adequately Alleged A Section 1595 Claim Against Facebook. .......................12

        A.      Facebook participated in a venture engaged in sex-trafficking. ...........................12

        B.      Facebook knowingly benefitted from its participation in the venture. ..................17

III.    In The Alternative, The Court Should Grant Leave To Amend. .......................................21

CONCLUSION....................................................................................................22

CERTIFICATE OF SERVICE ...........................................................................22

Plaintiff's Opposition to Meta Platforms, Inc.'s Motion for Judgment on the Pleadings
Case No. 23-CV-02387-JST

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ..................................................................4-5, 7-9

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ..........................................................................10

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) ..........................................................................8-9

*Does 1-6 v. Reddit, Inc.*,
   51 F.4th 1137 (9th Cir. 2022) ....................................................................... 19-20

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019) ..........................................................................10

*Eminence Cap., LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ...........................................................................21

*In re Facebook, Inc.*,
   625 S.W.3d 80 (Tex. 2021) ...................................................................... 5-6, 9, 16

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc) ......................................................... 5-7

*G.G. v. Salesforce.com, Inc.*,
   76 F.4th 544 (7th Cir. 2023) ............................................................... 13-15, 17, 20

*Geiss v. Weinstein Co. Holdings LLC*,
   383 F. Supp. 3d 156 (S.D.N.Y. 2019)............................................................. 19-20

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021), *vacated on other grounds*, 598 U.S. 617 (2023)........................10

*Gregg v. Hawaii, Dep't of Pub. Safety*,
   870 F.3d 883 (9th Cir. 2017) ...............................................................................3

*H.H. v. G6 Hosp., LLC*,
   2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) .....................................................19

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) ...............................................................................9

**Page(s)**

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ...........................................................................8

*LeGras v. AETNA Life Ins. Co.*,
    786 F.3d 1233 (9th Cir. 2015) ...........................................................................3

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) ............................................................20

*Rubin v. United States*,
    904 F.3d 1081 (9th Cir. 2018) ...........................................................................4

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) .............................................................................4

**Statutes**

18 U.S.C. § 1591 .............................................................................. 12-13, 19

18 U.S.C. § 1595.................................................. 1-3, 5, 7-8, 12-13, 17, 19-20

18 U.S.C. § 1595(a) ...................................................... 4, 12-13, 17, 19

47 U.S.C. § 230(c)(1)..........................................................................4, 7

Tex. Civ. Prac. & Rem. Code Ann. § 98.002(a) ........................................5

**Rule**

Fed. R. Civ. P. 15(a)(2)........................................................................21

**Other Authority**

Assembly Bill No. 1394 (approved Oct. 8, 2023)
    (to be codified at Cal. Civ. Code § 3345.1(g))........................................2

-iii-

1

**INTRODUCTION**

2      Facebook's Instagram platform operates as a breeding ground for sex trafficking and a
3  marketplace for the advertisement and sale of trafficking victims.  Facebook knowingly facilitates
4  this conduct, including through employing its technology and algorithms to create connections
5  between sex traffickers and victims.  Facebook's business model centers around connecting people
6  to maximize the growth of the platform, user engagement with the platform, and the advertising
7  revenue from people who interact with the platform.  Facebook directly and knowingly earns
8  advertising revenue off of the Instagram posts where trafficking victims are openly sold for sex.
9
10     Plaintiff Jane Doe is a victim of sex trafficking on Instagram.  Doe brought suit against
11 Facebook after its Instagram platform connected her with a sex trafficker, who openly sold her for
12 sex through posting public advertisements on Instagram.  Doe pleaded a claim against Facebook
13 under 18 U.S.C. § 1595 for its conduct in knowingly benefitting from participating in a venture
14 engaged in sex trafficking.  Doe's allegations—that Facebook profited from facilitating sex
15 traffickers in recruiting victims and advertising them for sale—lie at the heart of the conduct
16 Section 1595 prohibits.
17
18     Facebook claims that it is immune from any such allegations under Section 230 of the
19 Communications Decency Act.  But Section 230 provides websites with protection only where a
20 plaintiff brings a claim that faults the website for acting as a "publisher" of third-party content.
21 Section 230 provides no protection where, as here, Facebook greatly exceeds the traditional roles
22 of a publisher and takes active steps to facilitate and encourage sex trafficking and knowingly
23 benefits while doing so.  Facebook has been widely condemned for its prominent role in online
24 sex trafficking and should not be entitled to hide behind a misinterpretation of Section 230.  The
25 rampant problem of sex trafficking on social media platforms like Facebook is exactly what
26 inspired this state to recently enact new legislation that prevents social media platforms from
27
28

facilitating, aiding, or abetting commercial sexual exploitation and that imposes substantial statutory damages for each violation. *See* Assembly Bill No. 1394 (approved Oct. 8, 2023) (to be codified at Cal. Civ. Code § 3345.1(g)). The Court should deny Facebook's motion and give Doe the opportunity to have her day in court.

## STATEMENT OF THE ISSUES

1. Whether Jane Doe's civil sex-trafficking claim against Facebook under 18 U.S.C. § 1595 is barred by Section 230 of the Communications Decency Act.

2. Whether Jane Doe's complaint states a claim against Facebook under 18 U.S.C. § 1595.

## STATEMENT OF FACTS

Human trafficking is an epidemic that affects millions of victims worldwide. Dkt. 13 ¶ 97. Human trafficking has exponentially expanded in recent years through the use of the internet, particularly social media. *Id.* ¶¶ 98-99. Sex trafficking victims are recruited, advertised, sold, and exploited through social media. *Id.* Social media companies, including defendant Facebook (now known as Meta), play a critical role in facilitating and supporting sex trafficking ventures operated through their websites. *Id.* ¶¶ 1, 98-99, 141.

Facebook owns the social media website Instagram. *Id.* ¶¶ 1, 32. Plaintiff Jane Doe was an Instagram user in 2017. *Id.* ¶¶ 13, 110. Instagram's algorithms connected Doe with R.L., an adult sex trafficker with whom Doe had no prior relationship.[1] *See id.* ¶¶ 106-07, 110. Through Instagram, R.L. groomed Doe for trafficking. *Id.* ¶¶ 111, 113-15. By the summer of 2017, R.L. began making public posts on Instagram that openly and obviously advertised Doe for sale for sex. *Id.* ¶ 9-10, 116, 118-19, 122, 128-29, 134, 141. For the next year, Doe was repeatedly sold for sex

---

[1] Facebook states that Doe pleads Facebook "did not connect R.L. and [Doe]." Dkt. 84 at 2-3. That is inaccurate. *See, e.g.*, Dkt. 13 ¶¶ 106-07, 110.

through Instagram and was assaulted by numerous men. *Id.* ¶¶ 10, 128. R.L. was later convicted of sex trafficking crimes and was sentenced to 40 years in prison. *Id.* ¶ 133.

Doe's trafficking was facilitated by Facebook and occurred because she was connected with a sex trafficker on Instagram and was openly sold for sex on the platform. *Id.* ¶¶ 10-11, 106-07, 110, 116, 119-20, 122, 128-31, 141. Facebook's actions in this case are part of a pattern of behavior through which Instagram acts as a breeding ground for human trafficking and a marketplace for the sale of victims. *Id.* ¶¶ 1, 6, 103, 141. Facebook connects sex traffickers and victims through algorithms that suggest and encourage those connections. *Id.* ¶¶ 2-4, 105-07, 109, 141. Facebook is well aware of—and has even acknowledged—that sex trafficking is a rampant problem on its Instagram platform. *Id.* ¶¶ 1, 4, 7, 100-01, 103, 108, 112-13, 119, 123, 141. But Facebook facilitated and continues to facilitate sex trafficking on Instagram because Facebook directly profits from developing connections between Instagram users—including between sex traffickers and their victims—and promoting the use of its platform in order to maximize its advertising revenue. *Id.* ¶¶ 1-4, 8-9, 11, 101, 104-09, 119, 130, 134, 141-42, 147. Doe brought this lawsuit against Facebook, raising a claim under 18 U.S.C § 1595 based on Facebook's actions in knowingly benefitting from participating in a venture engaged in sex trafficking. *Id.* ¶¶ 135-47.

## LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c) is subject to the same legal standard as a Rule 12(b)(6) motion. *Gregg v. Hawaii, Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017). In reviewing a Rule 12(c) motion, a court must accept all factual allegations in the complaint as true and view them in a light most favorable to the plaintiff. *LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1236 (9th Cir. 2015). A court may grant judgment on the pleadings

only when, even taking the non-moving party's allegations as true, the moving party is entitled to

judgment as a matter of law. *Rubin v. United States*, 904 F.3d 1081, 1083 (9th Cir. 2018).

## ARGUMENT

I.  **Jane Doe's Sex-Trafficking Claim Against Facebook Is Not Barred By Section 230 Because The Claim Does Not Treat Facebook As A "Publisher Or Speaker" Of Third-Party Content.**

Doe's claim that Facebook knowingly benefitted from participating in a venture that

engaged in sex trafficking is not barred by Section 230 of the Communications Decency Act.

Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as

the publisher or speaker of any information provided by another information content provider."

47 U.S.C. § 230(c)(1).  Under this provision, Doe's claim is barred only if her claim treats

Facebook as the "publisher" of information provided by a third-party content provider.  But

Facebook's conduct in this case does not resemble any form of "publishing."  Therefore, Section

230 does not apply.

Doe's allegations that Facebook violated the anti-sex trafficking law in 18 U.S.C. § 1595(a)

by knowingly benefiting from facilitating sex trafficking on its Instagram platform do not fault

Facebook for engaging in any "publisher" functions under any reasonable reading of that term.  A

claim treats a defendant as a "publisher" only where it faults the defendant for decisions

"involv[ing] reviewing, editing, and deciding whether to publish or to withdraw from publication

third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *see also Zeran

v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (Section 230 bars "lawsuits seeking to hold

a service provider liable for its exercise of a publisher's traditional editorial functions").  Thus, the

Court must determine whether Doe's claim "treat[s]" Facebook as a publisher by seeking to hold

Facebook liable for engaging in these types of publisher functions.  While Section 230 does protect

-4-

websites from liability in some instances, the bare fact that a case involves information posted online is not sufficient: "neither [Section 230(c)] nor any other [subsection] declares a general immunity from liability deriving from third-party content." *Barnes*, 570 F.3d at 1100. Section 230 "was not meant to create a lawless no-man's-land on the Internet." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc).

Doe's allegations do not attempt to hold Facebook liable for engaging in any normal conduct of a "publisher." Rather, Doe faults Facebook for engaging in conduct that cannot be deemed a "traditional editorial function": actively facilitating online sex trafficking and reaping profits from doing so. *See, e.g.*, Dkt. 13 ¶¶ 1, 7, 9, 11-12, 104, 107-08, 130-31, 141-42, 147. Doe alleges that Facebook's Instagram product served as a breeding ground for human trafficking and a marketplace for the advertisement and sale of persons for sex. *Id.* ¶¶ 1, 6, 103, 141, 143. Facebook also assisted the sex traffickers in finding their victims and amplified their trafficking operations by using technology and algorithms to connect sex traffickers with vulnerable victims. *Id.* ¶¶ 2-4, 105-07, 109, 141. Facebook's actions in manufacturing relationships between sex traffickers and victims are entirely independent of any third-party user content posted to the Instagram platform, and the benefit derived from those connections are unrelated to any "publishing" activity. Facebook's active, participatory role in enabling, facilitating, and expanding sex trafficking on Instagram is detached from any responsibility normally associated with a "publisher." *See id.* ¶¶ 2-4, 6, 105-07, 109, 141.

The Texas Supreme Court addressed a nearly identical case in *In re Facebook* when it considered the applicability of Section 230 to sex-trafficking claims under Section 98.002 of the Texas Civil Practice and Remedies Code—a state-law provision "materially indistinguishable" from 18 U.S.C. § 1595. *In re Facebook, Inc.*, 625 S.W.3d 80, 96-101 (Tex. 2021); *see* Tex. Civ.

Prac. & Rem. Code Ann. § 98.002(a). That case involved the same core allegations against Facebook: Facebook violated anti-trafficking laws by creating a breeding ground for sex traffickers to entrap victims, assisting and facilitating sex traffickers, knowingly benefiting from rendering that assistance, and connecting human traffickers with potential targets of human trafficking. *In re Facebook,* 625 S.W.3d at 84-85, 96-98. The court concluded that Section 230 does not provide a defendant with protection from its own affirmative acts encouraging sex trafficking because such allegations "do not treat [the defendant] as a publisher who bears responsibility for the words or actions of third-party content providers. Instead, they treat [the defendant] like any other party who bears responsibility for its *own* wrongful acts." *Id.* at 97-98. The court found it "highly unlikely that Congress, by prohibiting treatment of internet companies 'as...publisher[s],' sought to immunize those companies from *all* liability for the way they run their platforms, even liability for their own knowing or intentional acts as opposed to those of their users." *Id.* at 98.

The court noted that its conclusion was consistent with existing Ninth Circuit authority, which "has held that defendants lose their CDA immunity if they go beyond acting as 'passive transmitter[s] of information provided by others.'" *Id.* (quoting *Roommates.com,* 521 F.3d at 1166). A defendant "that operates an internet platform 'in a manner that contributes to,' or is otherwise 'directly involved in,' 'the alleged illegality' of third parties' communication on its platform is 'not immune.'" *Id.* (quoting *Roommates.com,* 521 F.3d at 1169). The court held that the claim in that case was "predicated on allegations of Facebook's affirmative acts encouraging trafficking on its platforms," not the type of "passive acquiescence in the misconduct of its users" for which Section 230 would provide protection. *Id.* (quoting *Roommates.com,* 521 F.3d at 1169 n.24). The court concluded that "[l]ike the Ninth Circuit, we understand the [Communications

-6-

Decency Act] to stop short of immunizing a defendant for its 'affirmative acts ... contribut[ing] to any alleged unlawfulness' of 'user-created content.'" *Id.* (quoting *Roommates.com*, 521 F.3d at 1169).

This analysis is correct and is equally applicable to the nearly identical claim at issue here. The allegations that Facebook profited by knowingly facilitating and amplifying sex trafficking on Instagram fault Facebook for its own affirmative misconduct—these allegations do not merely fault Facebook for acting as "a passive transmitter of information provided by others." *See Roommates.com*, 521 F.3d at 1166. Because Doe's Section 1595 claim against Facebook here alleges that Facebook engaged in far more than passive "publisher" conduct, Section 230 provides Facebook with no defense.

Facebook's motion focuses almost exclusively on arguing that the content at issue here was provided by "another information content provider"—*i.e.*, that Facebook itself did not act as an "information content provider." Dkt. 84 at 6-9. But Doe is not arguing that Section 230 is inapplicable because Facebook acted as an information content provider. Doe is arguing that Section 230 is inapplicable because her claim does not seek to treat Facebook as a "publisher or speaker." As Facebook acknowledges, this is an independent element of the Section 230 defense. *See* Dkt. 84 at 5; *see also Barnes*, 570 F.3d at 1100-01 ("[Section 230(c)(1)] only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat…as a publisher or speaker (3) of information provided by another information content provider."). Thus, Facebook's lengthy arguments that it is not an "information content provider" because it did not "author," "create," or "materially contribute" to the content are irrelevant. *See* Dkt. 84 at 6-9; *see also Roommates.com*, 521 F.3d at 1167-68 ("information content provider" can include someone who "materially contribut[es]" to the alleged unlawfulness of the content);

-7-

*Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1268-71 (9th Cir. 2016) (addressing only the "information content provider" question).

Beyond Facebook's arguments about the "information content provider" issue, Facebook argues that Section 230 must apply because Doe would have no claim "but for the content created by R.L." Dkt. 84 at 11; *see also id.* at 5 (arguing that if R.L.'s posts "were removed from the equation, [Doe's] entire case would fall apart"); *id.* at 9 (arguing that the "source of [Doe's] injuries" is the posts selling her for sex). While there is no question that the sale of Doe for sex through posts on Instagram is an essential part of the fact pattern of this case, Facebook's argument is premised on a misunderstanding of the appropriate legal inquiry. As the Ninth Circuit has explained, Section 230 does not provide protection merely because some publication "could be described as a 'but-for' cause of [the plaintiff's] injuries." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016). While Doe may not have been injured absent R.L.'s posts on Instagram, "that does not mean the…[plaintiff's] claim seeks to hold [the defendant] liable as the 'publisher or speaker' of user content." *Id.* Thus, Facebook's focus—whether a published statement was a "but for" cause of Doe's injuries—does not address the legally relevant question of whether Doe's Section 1595 claim seeks to hold Facebook liable as a "publisher or speaker."

Facebook's arguments would entitle it to near blanket immunity from any suit because its entire business revolves around publishing third-party user information to its social media platforms. But Ninth Circuit authority already forecloses such a result. The *Internet Brands* court explained why Facebook's approach is untenable as applied to social networking websites: "[p]ublishing activity is a but-for cause of just about everything [the website] is involved in. It is an internet publishing business. Without publishing user content, it would not exist…. [H]owever, we held in *Barnes* that the [Communications Decency Act] does not provide a general immunity

-8-

against all claims derived from third-party content." *Id.*; *see also Barnes*, 570 F.3d at 1100.  And the Ninth Circuit has since reaffirmed the reasoning in *Internet Brands*.  As the court explained in *HomeAway.com, Inc. v. City of Santa Monica*, *Internet Brands* "rejected use of a 'but-for' test that would provide immunity under the [Communications Decency Act] solely because a cause of action would not otherwise have accrued but for the third-party content. We look instead to what the duty at issue actually requires."  918 F.3d 676, 682 (9th Cir. 2019) (citing *Internet Brands*, 824 F.3d at 851, 853).

Here, the duty imposed by Doe's claim required Facebook to not profit from encouraging and facilitating the use of Instagram as a platform to advertise trafficking victims.  Although Facebook argues that Doe's complaint turns on Facebook's "failure to monitor and remove content," Dkt. 84 at 10, the essence of Doe's complaint faults Facebook for its affirmative actions in profiting from creating a breeding ground for trafficking on Instagram, facilitating trafficking on Instagram, and connecting traffickers with vulnerable victims.  *See In re Facebook*, 625 S.W.3d at 97-98 (observing that nearly identical allegations against Facebook "alleg[e] affirmative acts by Facebook to encourage unlawful conduct on its platforms").  Even if Doe's complaint contains some allegations regarding Facebook's failure to monitor and remove content, that does not indirectly entitle Facebook to immunity for the other allegations that Facebook engaged in affirmative acts to facilitate sex trafficking.  Dkt. 84 at 10; *In re Facebook*, 625 S.W.3d at 97-98 (declining to apply Section 230 to claim premised on Facebook's affirmative acts encouraging wrongdoing, even though the plaintiffs' complaint contained other allegations about Facebook's passive acquiescence and failures to take action); *HomeAway.com*, 918 F.3d at 682 (Section 230 does not apply "any time a legal duty might lead a company to respond with monitoring or other publication activities").

Facebook also argues that the Ninth Circuit has rejected the notion that a defendant's use of algorithms can remove the defendant from the scope of Section 230's protections.  Dkt. 84 at 8, 11.  In some instances, the Ninth Circuit has concluded that a defendant's use of algorithms can be protected by Section 230.  *See Gonzalez v. Google LLC*, 2 F.4th 871, 894-97 (9th Cir. 2021), *vacated on other grounds*, 598 U.S. 617 (2023); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098-99 (9th Cir. 2019).  But in those cases the plaintiffs complained that the algorithms connected them to third-party *content*.  In *Gonzalez*, the defendant's algorithms served to "recommend ISIS content to users."  *Gonzalez*, 2 F.4th at 894.  In *Dyroff*, the defendant's algorithm, by analyzing user posts and recommending users to user groups, served to recommend "the content of others" posted in those groups.  *Dyroff*, 934 F.3d at 1098-99.  These actions implicate the functions of a publisher under Section 230 because promoting other people's content is a form of publication.  *See id.* ("By recommending user groups and sending email notifications…[defendant] was acting as a publisher of others' content.").[2]

This case is materially different than *Dyroff* and *Gonzalez*.  Doe does not complain that Facebook's algorithms suggested that she view certain content online that was harmful or offensive.  To the contrary, Facebook's use of its algorithm in this case had nothing to do with recommending any particular content.  Rather, Facebook employed its algorithm to deliver Doe into the hands of a criminal sex trafficker.  *See* Dkt. 13 ¶¶ 106-07, 110.  Creating this type of connection does not resemble any traditional "publisher" function.  Facebook's employment of its

---

[2] Facebook also states that the Ninth Circuit applied Section 230 "to a website that matched romantic partners based on their voluntary inputs."  Dkt. 84 at 8 (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003)).  The *Carafano* opinion mentions that the defendant, an internet dating service, offered a feature that "'match[ed] profiles with similar characteristics."  *Carafano*, 339 F.3d at 1124-25.  But the opinion offers no further explanation of the feature, no suggestion that it played any role in the case, and no discussion of how that feature would interact with Section 230.

algorithm as a recruitment tool for sex traffickers—enabling them to entrap vulnerable victims—is not entitled to Section 230 protection.  In any event, as discussed above, this case involves more than Facebook's use of algorithms—it concerns Facebook's creation of a marketplace for sex trafficking through which traffickers posted victims for sale and from which Facebook generated advertising revenue.  *See supra* at 5; *see also infra* Part I.A.

Lastly, Facebook argues that Section 230 cannot be avoided through "artful pleading." Dkt. 84 at 9-12.  Doe does not dispute the general principle that a party cannot use "artful pleading" to mask the substance of that party's allegations, but that argument just begs the same question as Facebook's other arguments: what is the substance of Doe's allegations, and do those allegations require Facebook to be treated as a publisher?  Thus, Facebook's artful pleading argument is simply another way of rehashing its position that Section 230 should apply merely because Doe was injured through sex-trafficking advertisements posted by R.L.  Dkt. 84 at 9 (arguing that Doe is engaged in "artful pleading" because she is attempting to "distract" and "obscure" the fact that R.L.'s sex-trafficking advertisements caused her injuries).  For the reasons explained above, Section 230 does not apply merely because third-party content served as a but-for cause of Doe's injuries.  *See supra* at 8-9.  And as already explained, the crux of Doe's allegations do not fault Facebook for engaging in any "publishing" conduct.  Instead, they fault Facebook for benefiting from engaging in various conduct to facilitate sex trafficking on its platform.  Because Doe's claim does not attempt to treat Facebook as a "publisher" of third-party content, but instead seeks to impose liability on Facebook for its own practices in facilitating online sex trafficking, Section 230 does not bar Doe's claim.[3]

---

[3] Facebook's brief addresses whether Doe's claim satisfies the exception to Section 230 in the Fight Online Sex Trafficking Act.  *See* Dkt. 84 at 12-14.  The Court need not address that issue

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**II.    Jane Doe Adequately Alleged A Section 1595 Claim Against Facebook.**

Doe has adequately alleged a Section 1595 claim against Facebook.  Under Section 1595, "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits…financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)."  18 U.S.C. § 1595(a).  The "violation of this chapter" at issue in this case is a violation of 18 U.S.C. § 1591—the criminal sex-trafficking statute.  It is undisputed that Doe is "a victim of a violation of this chapter" who can bring a claim under Section 1595 because she is a victim of a sex-trafficking crime under 18 U.S.C. § 1591.  *See* Dkt. 13 ¶¶ 13, 90, 136.  Doe testified at her trafficker's criminal trial where he was convicted of sex-trafficking crimes and sentenced to 40 years in prison.  *Id.* ¶ 133.

The remaining elements of a Section 1595 claim require proof that the defendant (1) "knowingly benefit[]…financially or by receiving anything of value," (2) "from participation in a venture," (3) "which that person knew or should have known has engaged in an act in violation of this chapter."  18 U.S.C. § 1595(a).  Facebook challenges the adequacy of the pleading only on the first two elements: whether Facebook "participat[ed] in a venture" and whether Facebook "knowingly benefit[ted]" from that participation.  *See* Dkt. 84 at 1, 14.  Both are adequately alleged here.

**A.    Facebook participated in a venture engaged in sex-trafficking.**

Doe adequately alleged that Facebook participated in a venture that engaged in violations of the criminal prohibition on sex trafficking in 18 U.S.C. § 1591.  *See* 18 U.S.C. § 1595(a).

---

because, as explained above, Doe's claim does not fall within the scope of Section 230 in the first instance.

Because Section 1595 applies to *both* "perpetrators" of criminal acts and those who "knowingly benefit[]…from participation in a venture" that violates sex-trafficking laws, the statute on its face makes clear that a defendant need not be a "perpetrator" of criminal acts to be held liable.  *See id.*  Thus, "'participation' does not require 'direct participation in the sex trafficking'….  It is the venture that must violate Section 1591, and not the participant."  *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 559 (7th Cir. 2023).  "Participation," therefore, is interpreted "in accord with our 'ordinary understanding of culpable assistance to a wrongdoer,' which requires only 'a desire to promote the wrongful venture's success.'"  *Id.* (citation omitted).

As an initial matter, Facebook does not challenge that some of its users are sex traffickers who engage in criminal sex-trafficking violations through its Instagram platform.  That is beyond dispute because sex traffickers knowingly recruit victims through Facebook's Instagram platform, force them to engage in sex acts in exchange for money, advertise them for sale for sex on Instagram, and sell them to sex buyers through Instagram.  *See, e.g.*, Dkt. 13 ¶¶ 1, 6, 10-11, 100, 103, 141-46.  Facebook's challenge is limited to the question of whether its conduct amounts to "participation" in the ventures engaged in criminal sex trafficking on Facebook's Instagram platform.  *See* Dkt. 84 at 16-17.  As explained below, Facebook's participation is clear—indeed, Facebook's participation is integral because Instagram provides the platform through which the victims are sold for sex, and Instagram facilitates those sales by actively creating connections among sex traffickers, victims, and sex buyers.

Facebook facilitates online sex trafficking through its Instagram product.  Dkt. 13 ¶¶ 1, 7, 9, 11-12, 104, 107, 130-31, 141-42, 147.  Instagram operates as a breeding ground for human trafficking and a marketplace through which human trafficking victims are recruited and advertised for sale online.  *Id.*  ¶¶ 1, 6, 103, 141, 143.  By providing its Instagram platform to sex

traffickers as a marketplace for their victims, Facebook effectively provided the home base for these traffickers' ventures. *See id.* A sex trafficker cannot traffic its victims and cannot profit if it does not have a place to advertise and sell those victims to interested sex buyers, and Facebook provided that critical linchpin in the traffickers' operations. *See id.* Thus, Facebook's Instagram product made possible and facilitated the trafficking of numerous victims, including Doe. *See, e.g.*, *id.* ¶¶ 6, 11, 84, 130-31, 141.

But it goes further than that. Beyond operating the platform that served as the marketplace for the trafficking and sale of Doe and other victims, Facebook actively assisted and magnified the sex traffickers' operations by employing its technology and algorithms to connect sex traffickers and victims. *Id.* ¶¶ 2-4, 105-07, 109, 141. Indeed, Instagram's algorithms connected Doe with her sex trafficker, a man who was unknown to her and who otherwise had no relationship to her. *See id.* ¶¶ 106-07, 110. Thus, this is not a case where Facebook was passive with respect to sex trafficking occurring on Instagram—rather, this is a case where Facebook took an active role in the expansion of sex trafficking on its Instagram platform by proliferating connections between sex traffickers and their victims. *See id.* ¶¶ 2-4, 6, 105-07, 109, 141.

In providing a breeding ground for traffickers to entrap and sell sex trafficking victims and directly assisting sex traffickers in connecting with trafficking victims, Facebook participated in the venture by providing "culpable assistance to a wrongdoer" that facilitated the success of the trafficker's ventures. *G.G.*, 76 F.4th at 559-60. As explained below, Facebook had a strong desire to promote the success of the venture because enabling trafficking on Instagram and creating connections between traffickers and victims directly increased Facebook's profits through increased user engagement and advertising revenue. *See infra* Part II.B.

-14-

Facebook argues that Doe cannot allege participation because there are no facts pleaded to "show any 'continuous business relationship,' specific 'business deal,' or any 'monetary relationship' between [Facebook] and R.L." Dkt. 84 at 16. As an initial matter, these are not the exclusive ways to show "participation." *See G.G.*, 76 F.4th at 559 ("participation" requires a showing of "culpable assistance to a wrongdoer," which a plaintiff "*may* sufficiently allege…by showing 'a continuous business relationship' between the participant and the trafficker" (emphasis added)). These are just examples of different ways a plaintiff can establish the ultimate requirement—that the defendant "participated" by providing assistance that facilitated the success of the venture. *Id.* at 560 (an allegation of a continuous business relationship "gives rise to an inference…that the civil defendant facilitated the venture's success"). For the reasons explained above, Facebook's actions amounted to "participation" because Facebook facilitated the success of ventures engaged in trafficking on the Instagram platform.

But even assuming a "business" or "monetary" relationship were required to establish participation, there is no question that Facebook and R.L. had a monetary relationship. R.L. was a user of Facebook's Instagram platform—in essence, R.L. was a client of Facebook. *See* Dkt. 13 ¶¶ 110-11, 114-16. Although Facebook may allow users to join Instagram for free, that membership is premised on an exchange with monetary value to Facebook: Facebook provides the user with access to Instagram, and in turn the user provides access to its data and engages other users with the platform, all of which ultimately enhances Facebook's ability to profit through advertising to its users. *See id.* ¶¶ 2, 5, 8-9, 106, 108-09, 119-20, 141. Facebook's business model is premised on using growth tactics to attract more users and connecting those users with each other to maximize user engagement and advertising revenue. *Id.* That is precisely why Facebook is willing to have a relationship with sex traffickers like R.L.—because the relationship is a

-15-

"monetary relationship" that leads to profits for Facebook. *See id.* ¶¶ 4, 8-9, 11, 109, 120, 141-42, 147. Facebook is a business—it does not offer its products to traffickers out of benevolence but because it is a money-making, business proposition to have a relationship sex traffickers who engage with the Instagram platform. *See also infra* Part II.B.

Contrary to Facebook's argument, the allegations here are not simply that Facebook was a but-for cause of Doe's injuries. Dkt. 84 at 16. Facebook's role here greatly exceeds simply being a part of the chain of events. As explained above, Facebook actively facilitated Doe's trafficking by connecting her with R.L., creating the breeding ground for sex trafficking where she was entrapped, and providing the marketplace where she was openly advertised for sex and sold to sex buyers. *See id.* ¶¶ 1, 6, 103, 106-07, 110, 141. As noted above, in a nearly identical case, the Texas Supreme Court recognized that these sorts of allegations make clear that Facebook was not a passive intermediary—rather, these statements "alleg[e] affirmative acts by Facebook to encourage unlawful conduct on its platforms." *In re Facebook, Inc.*, 625 S.W.3d at 98.

And it is no defense that Facebook provided its social media service to other users who are not sex traffickers. Dkt. 84 at 16-17. Facebook's Instagram platform has legitimate uses for legitimate users that have no relationship to criminal activity. But that cannot excuse Facebook's conduct when it employs its products to facilitate illegal sex trafficking, to connect sex traffickers and vulnerable victims, or to serve as a marketplace for the sale of trafficking victims. *See* Dkt. 13 ¶¶ 1, 6-9, 11-12, 99, 103-04, 106-07, 110, 130-31, 141-42, 147. Holding Facebook liable for this conduct would not mean Facebook has "a legal duty to inspect every single user-generated message before it is communicated." Dkt. 84 at 17. The focus of the complaint here is about fundamental problems with the way Facebook has chosen to operate its platforms and algorithms to facilitate sex trafficking—issues larger than an individual message. In any event, Facebook's

-16-

implication that it would have to manually review individual user messages is false. Facebook has technology that allows it to scan user messages to detect established signs of grooming and human trafficking. Dkt. 13 ¶ 113. Facebook has failed to make proper use of such simple technological safeguards because doing so would decrease the presence of sex trafficking on Instagram and thereby decrease user engagement with the platform and negatively impact Facebook's profits. *Id.* ¶ 113, 141.

Facebook's conduct with respect to the traffickers and trafficking victims on its Instagram platform strikes at the heart of the purpose of Section 1595. Doe's allegations regarding Facebook's conduct are more than sufficient to show "participation" for the purposes of a motion to dismiss.

> ### B.      *Facebook knowingly benefitted from its participation in the venture.*

Doe also adequately alleged that Facebook "knowingly benefit[ted]…financially or by receiving anything of value" from its participation in the venture. 18 U.S.C. § 1595(a). A plaintiff can satisfy this element "by alleging only that the defendant was aware that it was benefitting in some way from its participation in the venture." *G.G.*, 76 F.4th at 564. As explained below, Facebook knowingly profits from creating connections between sex traffickers and their victims on its Instagram platform, and Facebook profits from serving as a marketplace for the sale of trafficking victims because it sells advertising space on the Instagram posts through which victims are sold for sex.

Facebook measures its profits in terms of "connections" between its users. Dkt. 13 ¶ 2. Connections between users are directly connected to Facebook's profits because connections increase user engagement with the Instagram platform. *Id.* When user engagement increases, users spend more time on Instagram, Facebook collects more data, and Facebook generates more

advertising revenue. *Id.* ¶¶ 2, 109. Thus, creating connections between its users is a critical aspect of Facebook's business because more connections between Instagram users generates more profit through advertising. *Id.* ¶ 2. To maximize connections and the resulting profits, Facebook uses its technology and algorithms to suggest and encourage Instagram users to connect with each other. *Id.* ¶¶ 2-3.

Relevant here, Facebook's Instagram platform creates connections between sex traffickers and their victims, like Doe. *Id.* ¶¶ 3-4, 105-07, 109, 141. Facebook also creates connections between other persons involved in sex trafficking, such as traffickers and sex buyers. *Id.* ¶ 109. Facebook knows facilitating connections between sex traffickers, victims, and sex buyers increases user engagement with Instagram and thereby increases its advertising revenue. *Id.* ¶¶ 4, 11, 109, 141. In addition, Facebook profits from serving as an online breeding ground for the sale of trafficking victims because Facebook sells advertisements on the Instagram pages that promote sex trafficking and sell sex trafficking victims, like the posts through which Doe was sold for sex. *Id.* ¶¶ 11, 108, 141-42. Thus, Facebook knowingly benefits from facilitating sex trafficking on Instagram because doing so increases its user base and advertising revenue, including through traffickers selling victims on Instagram and through sex buyers visiting Instagram to purchase sex. *See, e.g., id.* ¶ 142.

Facebook has long known that it financially benefits from sex trafficking occurring on its platform and from the harmful connections it creates. *Id.* ¶¶ 4, 142. Yet Facebook enabled traffickers to openly sell Jane Doe and other victims for sex on Instagram because taking any action against Doe's trafficker and people like him would hurt Facebook's bottom line by decreasing user engagement with Instagram, engagement with advertisements, and Facebook's profits. *Id.* ¶¶ 120, 123, 141. In short, Facebook continues to facilitate sex trafficking through Instagram because

-18-

putting a stop to sex trafficking would reduce its profits from advertising, and advertising is the heart of Facebook's profit model.  *Id.* ¶¶ 9, 11, 120, 141, 147.

In its motion, Facebook suggests that it cannot be held liable under Section 1595 unless it received money in direct exchange for facilitating Doe's trafficking, such as receiving a payment from Doe's trafficker.  Dkt. 84 at 14-15.  But the statute does not impose so high a standard.  The statute requires only that Facebook "knowingly benefit[s]…from participation in a venture" engaged in trafficking.  18 U.S.C. § 1595(a).  Nothing in the statute suggests that there must be an exchange of money directly traceable to the plaintiff's trafficking.  *See H.H. v. G6 Hosp., LLC*, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019) ("The statutory language requires that Defendant knowingly benefit financially, not that the perpetrator compensate Defendant 'on account of' the sex trafficking.").

In support of its position, Facebook cites language from *Does 1-6 v. Reddit, Inc.* that "knowingly benefitting from participation in such a venture requires actual knowledge and 'a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit.'" 51 F.4th 1137, 1145 (9th Cir. 2022) (quoting *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019)).  But as Facebook recognizes in a footnote, the *Reddit* court was discussing the "knowing benefit" standard under the federal *criminal* provision in Section 1591, not the civil provision in Section 1595.  Dkt. 84 at 15 n.2.  The Ninth Circuit has not addressed the "knowing benefit" standard for a civil claim under Section 1595.  *Id.*  The *Reddit* court cited *Geiss* for the purposes of establishing the *criminal* standard under Section 1591.  The court did not address whether the *Geiss* court was correct in its belief that the same standard would apply to a civil claim under Section 1595.

Multiple courts have recognized that *Geiss* was wrongly decided with respect to Section 1595. As the court explained in *G.G.*, under the plain language of Section 1595, "a plaintiff can allege that the defendant 'knowingly benefitted' by alleging only that the defendant was aware that it was benefitting in some way from its participation in the venture. That's it.… [T]he benefit need not take the form of 'profits' that are 'the specific result' of a sex-trafficking venture." *G.G.*, 76 F.4th at 564. The court explicitly rejected the reading in *Geiss*, explaining that "*Geiss* read 'knowingly benefits' to require a *quid pro quo* between trafficker and participant. But Section 1595 says nothing about why the sex-trafficker provides any benefit to the participant-defendant. In fact, the statute does not even require that the sex trafficker itself or himself provide any benefit." *Id.* at 565. As the court recognized, "*Geiss* is an outlier whose gloss on 'knowingly benefits' has been rejected by virtually every other court." *Id.* at 565 n.20 (collecting cases); *see also M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019) (collecting cases rejecting the *Geiss* court's interpretation). This Court should not adopt the widely rejected interpretation of Section 1595 set forth in *Geiss*.

In any event, there was "a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit" in this case. *Reddit*, 51 F.4th at 1145; Dkt. 84 at 15. As explained above, Facebook advertises on and makes money from the trafficking posts through which Doe and other victims are sold. Dkt. 13 ¶¶ 11, 108, 141-42. Therefore, if Facebook had not provided the platform through which Doe and other victims were posted for sale, Facebook never would have earned the advertising revenue associated with those trafficking posts. Likewise, Facebook facilitated sex trafficking by creating connections between sex traffickers and their victims, and Facebook directly "recei[ved]…a benefit" from this affirmative conduct because connections are equivalent to profit for Facebook. *See id.* ¶¶ 2, 4, 11, 109, 141. Facebook

-20-

seemingly argues that there is no "connection" to any benefit here because Doe does not plead that Doe's trafficker created an Instagram account because of her trafficking.  Dkt. 84 at 15.  But the creation of additional Instagram accounts is not the only way Facebook could "benefit" from its participation in the venture.  As just explained, Facebook benefitted in other ways, including additional advertising revenue.  Doe's allegations regarding the ways in which Facebook benefited from participating in the venture engaged in trafficking are more than sufficient at the pleading stage.

## III.   In The Alternative, The Court Should Grant Leave To Amend.

If the Court concludes that Doe's complaint is inadequate, Doe requests leave to amend her complaint to correct any deficiencies identified by the Court and to further expand upon the allegations detailing Facebook's central role in facilitating online sex trafficking through its Instagram platform.  The Court should "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  "This policy is 'to be applied with extreme liberality.'"  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted).  A complaint brought by a sex trafficking victim against a company that facilitated and profited from her sex trafficking should not be dismissed without a fulsome presentation of the facts.  And the Court has not previously identified any deficiencies in Doe's complaint or ordered a dismissal.  *See id.* at 1052 (court may consider, *inter alia*, "repeated failure to cure deficiencies by amendments previously allowed" in deciding whether to grant leave to amend). Thus, to ensure that justice may be done, Doe requests leave to amend her complaint to address the Court's concerns if the Court determines her complaint should be dismissed.

-21-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CONCLUSION**

For these reasons, Plaintiff Jane Doe prays that Facebook's motion for judgment on the pleadings be denied.  In the alternative, Plaintiff requests leave to amend her complaint.  Plaintiff also prays for all other relief to which she may be entitled.

Dated:  October 20, 2023

Respectfully submitted,

 /s/   *Matthew S. Parmet*
Matthew S. Parmet
CA State Bar No. 296742
PARMET, PC
440 N. Barranca Ave., No. 1228
Covina, California  91723
Telephone:  (310) 928-1277

Annie McAdams, *pro hac vice*
ANNIE MCADAMS PC
1150 Bissonnet
Houston, Texas  77005
Telephone:  (713) 785-6262

David E. Harris, *pro hac vice*
SICO HOELSCHER HARRIS, LLP
802 N. Carancahua, Suite 900
Corpus Christi, Texas  78401
Telephone:  (361) 653-3300

Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing response was served in electronic form on counsel of record by filing it using the Court's CM/ECF system on October 20, 2023 as follows.

 /s/   *Matthew S. Parmet*
Matthew S. Parmet

IM-#10175306.4

-22-