Amanda J. G. Walbrun
CA State Bar No. 317408
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California  91367
Telephone:  (818) 340-5400
walbrun@boucher.la

Annie McAdams, *pro hac vice*
ANNIE MCADAMS PC
2900 North Loop West, Suite 1130
Houston, Texas  77092
Telephone:  (713) 785-6262
annie@mcadamspc.com

David E. Harris, *pro hac vice*
SICO HOELSCHER HARRIS, LLP
819 N. Upper Broadway
Corpus Christi, Texas  78401
Telephone:  (361) 653-3300
dharris@shhlaw.com

Attorneys for Plaintiff, Jane Doe, (K.B.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE (K.B.),<br>        Plaintiff,<br><br>v.<br><br><br>BACKPAGE.COM, LLC; et al.<br>        Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

CASE NO.: 23-CV-02387-RFL

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

DEMAND FOR JURY TRIAL

TO THE HONORABLE JUDGE OF SAID COURT:

Comes Now, Jane Doe (K.B.), Plaintiff in the above-styled and numbered cause and files this Third Amended Complaint, complaining of Facebook, Inc. n/k/a Meta Platforms, Inc. (hereinafter referred to as "Facebook"), as Defendant, and respectfully shows the Court as follows:

## I.   SUMMARY OF THE LAWSUIT

1.      Facebook, through its products like the social media website Instagram, has created a breeding ground for human trafficking, and has knowingly benefited from facilitating a trafficking hub. Facebook and Facebook's products, and in particular Instagram, provide an environment through which persons are recruited, groomed and sold for sex online.

2.      Facebook knows that its products, by and through its affirmative acts, omissions and design, actively facilitate human trafficking online. Rather than address the harm that its product has created, Facebook openly continues to profit and benefit from the trafficking of survivors like Jane Doe.

3.      Facebook's business model is "connections." Connecting users at all costs, even when they know those connections are harmful. From those connections, Facebook profits from the sale of advertisements and user data. To drive profits, Facebook's technology encourages connections and monetizes the content of the resulting communications.

4.      Facebook promotes connections between its users knowingly and with intention. Facebook even connects persons engaged in sex trafficking with vulnerable persons and sex buyers, as they did in Jane Doe's case.

5.      Facebook has known, and openly discussed internally since as early as 2012, that it financially benefits from sex trafficking and has knowingly ignored the harmful connections it

has created.  In some cases, this is willful blindness.  In others, Facebook simply embraces that this is a natural consequence of its business model.

6.    In 2016, Facebook executive acknowledged the extensive harm created by its products.  In his article "The Ugly," Facebook Vice President Andrew Bosworth circulated alarming comments about the harm caused by Facebook's aggressive growth strategy:[1]

> We talk about the good and the bad of our work often. I want to talk about the ugly. We connect people. That can be good if they make it positive. Maybe someone finds love. Maybe it even saves the life of someone on the brink of suicide. So we connect more people. That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools. And still we connect people.
>
> The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is *de facto* good. It is perhaps the only area where the metrics do tell the true story as far as we are concerned. That isn't something we are doing for ourselves. Or for our stock price (ha!). It is literally just what we do. We connect people. Period.
>
> That's why all the work we do in growth is justified. All the questionable contact importing practices. All the subtle language that helps people stay searchable by friends. All of the work we do to bring more communication in. The work we will likely have to do in China some day. All of it. The natural state of the world is not connected. It is not unified. It is fragmented by borders, languages, and increasingly by different products. The best products don't win. The ones everyone use win.
>
> I know a lot of people don't want to hear this. Most of us have the luxury of working in the warm glow of building products consumers love. But make no mistake, growth tactics are how we got here. If you joined the company because it is doing great work, that's why we get to do that great work. We do have great products but we still wouldn't be half our size without pushing the envelope on growth. Nothing makes Facebook as valuable as having your friends on it, and no product decisions have gotten as many friends on as the ones made in growth. Not photo tagging. Not news feed. Not messenger. Nothing.
>
> In almost all of our work, we have to answer hard questions about what we believe. We have to justify the metrics and make sure they aren't losing out on a bigger

---

[1] Ryan Mac et al., *Growth At Any Cost: Top Facebook Executive Defended Data Collection In 2016 Memo—And Warned That Facebook Could Get People Killed*, BuzzFeedNews, https://www.buzzfeednews.com/article/ryanmac/growth-at-any-cost-top-facebook-executive-defended-data#.upw3jdyR8.

picture. But connecting people. That's our imperative. Because that's what we do. We connect people.

7.     By justifying the metrics at all costs and fostering connections even amongst known bad actors, Facebook's products continue to this day to be a leading marketplace through which survivors and victims of human trafficking are groomed, recruited, and sold for sex against their will, without consent.  Just like Jane Doe,  human trafficking victims are regularly posted on Facebook's Instagram product and sold into trafficking. The transactions between human traffickers and sex buyers often begin with, and are made possible by, Facebook's Instagram product and its accompanying features. Instagram, therefore, provides a mission critical component for many sex trafficker's operations.

8.     Facebook knows, and has been aware for an unconscionable period of time, that it continues to profit through products which provide a platform that actively facilitate and promote sex trafficking and the sale of sex.

9.     Facebook's internal communications openly discuss what to do with its ill-gotten financial benefit derived from human trafficking, yet nothing changes.

10.     Numerous organizations and news outlets have reported on the rampant problem of sex trafficking on Instagram and the devastating effect on the victims of that trafficking.  At all relevant times, it has been well documented that sex traffickers use Facebook's Instagram product to target and exploit vulnerable persons.

11.     And Facebook has, for some time, knowingly benefitted financially from its involvement in trafficking through its products.  Indeed, Facebook has knowingly earned significant profits as a result of organized sex trafficking occurring on Facebook's products through advertisements and increased user engagement.

12.     With its profit-at-all-costs growth model, Facebook failed to take steps that a reasonable and prudent social media company would take to prevent trafficking, including the trafficking of Jane Doe.  Facebook put its Instagram product into the marketplace despite the product's defective design, which contains inadequate age and identity verification procedures, inadequate mechanisms to prevent fake accounts which allow sex traffickers to operate surreptitiously on Instagram, and inadequate mechanisms for users to report sex trafficking on Instagram.  Facebook further has failed to implement adequate warnings about the dangers of sex trafficking on its Instagram product, which were reasonably foreseeable to Facebook and in fact have long been well-known to Facebook.  The defective design of Facebook's Instagram product, which facilitates trafficking on Instagram, and Facebook's failure to include adequate warnings of the risks of trafficking with its Instagram product, have foreseeably led to more users being entrapped and forced into sex trafficking through Instagram, including Plaintiff Jane Doe.  Thus, Facebook not only tolerates sex trafficking on its Instagram platform, it knowingly assists, supports, and/or facilitates trafficking through its defective product features.

13.     Facebook's motivation is obvious: Facebook has not taken steps that would deter or shut down trafficking on its platforms because doing so would reduce its user base, reduce user engagement with its products, decrease the amount of data Facebook can collect, and ultimately affect its profits from advertising. Because facilitating sex trafficking through its products improves Facebook's bottom line, Facebook will not stop the sale of human beings through its products absent court intervention.

14.     Facebook solicited customers, including Jane Doe, on the open market and encouraged the use of its defective Instagram product.  Instagram's defective design, absence of adequate warnings, and operation as a hub for the recruitment and sale of sex trafficking victims

-4-

directly injured Jane Doe, who was forced into sex trafficking through Instagram. Jane Doe was initially recruited and groomed through Instagram by a sex trafficker operating through a fake account with a false identity. Jane Doe was then, on multiple occasions, publicly posted for sale on Instagram. The posts selling Jane Doe for sale on Instagram contained obvious indicators of human trafficking that, at the time, had long been widely recognized by law enforcement and trafficking experts. Through these Instagram posts, Jane Doe was sold to sex buyers in Houston and forced to engage in sex acts.

15.    Despite the actual and public trafficking occurring on Facebook's Instagram platform, including the **open and obvious** trafficking of Jane Doe, Facebook continues to take actions that facilitate and make possible the trafficking of victims like Jane Doe because doing so creates profit for Facebook. Facebook has failed to address the known design defects in its Instagram product that enable sex trafficking, including by placing Instagram on the marketplace with inadequate age and identity verification and lack of meaningful mechanisms to prevent fake accounts—enabling traffickers to operate anonymously—and by failing to adopt appropriate mechanisms to permit users to effectively report sex trafficking.  Facebook has also failed to warn about the dangers of sex trafficking on its Instagram product, although those dangers were known to and foreseeable to Facebook, leaving users like Jane Doe unaware of the danger and unable to recognize the telltale signs of human trafficking.  The end result is that Facebook's Instagram product is unsafe and causes injuries to victims like Jane Doe who become entrapped in trafficking through Instagram.  Facebook could have, but purposefully failed to, alter the design of its Instagram product to avoid injuries to users like Jane Doe.

16.     The law, however, squarely prohibits such actions. The law prevents Facebook from putting a defectively designed product into the marketplace and obligates Facebook to include adequate warnings of the known and foreseeable dangers posed by its product.

17.     Further, in enacting 18 U.S.C. § 1595, Congress created a beneficiary liability claim that enables victims of sex trafficking and other illegal actions to seek recompense against companies who knowingly benefit from facilitating such illegal activity. This provision prohibits Facebook from retaining the benefits of facilitating human trafficking through its products.

18.     Jane Doe files this lawsuit to hold Facebook accountable for the personal injuries resulting from Facebook's wrongful conduct, including designing a defective product that caused injuries to Jane Doe, failing to provide adequate warnings about the danger of human trafficking on its Instagram product despite Facebook's knowledge of that danger, failing to use reasonable care in the design and marketing of its Instagram product, and facilitating Jane Doe's recruitment and sale into trafficking.

## II.   THE PARTIES

### A.   Plaintiff

19.     Plaintiff Jane Doe (K.B.) was at all relevant times a victim of a violation of the sex trafficking laws set forth in 18 U.S.C. § 1591. Jane Doe was a user of Facebook's Instagram product who was injured due to her use of the product.  Jane Doe was harmed as a direct and proximate result of Facebook's wrongful conduct.  Jane Doe is a resident of Florida. Given the nature of these allegations, this complaint identifies Plaintiff as "Jane Doe (K.B.) or Jane Doe" throughout. She may be contacted through her lead counsel, whose information is contained below. There is a collective and compelling interest in keeping Jane Doe's identity anonymous.

**B.     Facebook**

20.     Facebook, Inc. ("Facebook") n/k/a Meta Platforms, Inc. is a foreign corporation, incorporated in Delaware and with its headquarters and principal place of business in California. Facebook can be served through its attorney of record, Collin J. Cox, Gibson, Dunn & Crutcher LLP, 811 Main Street, Suite 3000, Houston, Texas 77002-6117, CCox@gibsondunn.com.

21.     Facebook owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes digital products available through mobile and web-based applications, including Facebook's Instagram product.

22.     All references to Facebook include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual/implied/apparent authority), employee, person, firm, or corporation acting on behalf of Facebook now or at any relevant time.

### III.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) (1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Additionally, the Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over related state-law claims pursuant to 28 U.S.C. § § 1367 because all claims form part of the same case or controversy.

24.     This Court has personal jurisdiction over Facebook because Facebook is headquartered and locates its principal place of business in this district in Menlo Park, San Mateo County, California, is qualified to do business in California, and has contacts so continuous and systematic that it is essentially at home in this state.  Facebook regularly conducts and solicits business in California, provides products to persons here, and derives substantial revenue from

the state.  Additionally, the Northern District of California is the proper venue for this action under 28 U.S.C. §§ 1391(a), (b), and (d) because Facebook is headquartered and resides in this district and a substantial part of the events or omissions giving rise to the causes of action occurred in this district.  Further, this case was transferred to this district at Facebook's request as a result of Facebook's motion to transfer venue to this district pursuant to a forum-selection clause.

## IV.   ASSUMED OR COMMON NAME

25.     Jane Doe (K.B.) brings this case under a pseudonym to protect her from her traffickers, johns, and others who pose a serious, imminent and actual risk to her safety if her name is revealed.

## V.   CONDITIONS PRECEDENT

26.     All conditions precedent to the filing of this lawsuit have been performed or have occurred.

## VI.   FACTUAL ALLEGATIONS

**A.   Sex trafficking has reached epidemic proportions in the United States as a direct result of the internet and the rise of social media companies like Facebook.**

27.     The number of human trafficking victims has grown exponentially in recent years. Historically, sex trafficking and prostitution took place out on the street. Now, most sex trafficking, including the trafficking of Jane Doe, occurs online. Online exploitation of victims has transformed the commercial sex trade and, in the process, has contributed to the explosion of domestic sex trafficking. Social networks and online-classified sites are being used by traffickers to market, recruit, sell, and exploit victims for criminal purposes.  The internet and other modern technologies give traffickers the unprecedented ability to exploit a greater number

of victims and advertise their services across geographic boundaries.[2] These technologies impact various aspects of trafficking, from grooming, recruitment, and control of victims to advertising, movement, and financial transactions.[3] With the development of modern technology, pimps and traffickers can reach entirely new audiences, evade law enforcement detection, and maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods.

28.     Criminal human traffickers recognize that the success of their enterprises often depends on their ability to disguise themselves and operate unverified on social media platforms like Facebook and Instagram. Criminal human traffickers use these platforms to groom and recruit victims, such as Jane Doe, by gaining their trust and deceiving the victims as to their true intentions.

**B.     Facebook knowingly benefits from facilitating human trafficking on its Instagram platform, and Facebook has placed its Instagram product on the market despite known design defects and inadequate warnings that enable trafficking.**

29.     Facebook is the designer, manufacturer, formulator, constructor, and producer of the Instagram product, one of the world's most popular social media products, through which users post photographs and connect and communicate with other users.  Facebook marketed and put the Instagram product into the stream of commerce for use by the general public, including Jane Doe, and in doing so implicitly and explicitly represented that the product was safe for its intended use as a social media application.

---

[2] Mark Latonero et al., *Human Trafficking Online: The Role of Social Networking Sites and Online Classifieds*, University of Southern California (2011), https://technologyandtrafficking.usc.edu/files/2011/09/HumanTrafficking_FINAL.pdf.

[3] Mark Latonero et al., *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, University of Southern California (November 2012), https://technologyandtrafficking.usc.edu/files/2012/11/HumanTrafficking2012_Nov12.pdf.

Case No. 23-CV-02387-RFL

30.     Facebook placed its Instagram product into the stream of commerce and generated revenue from the distribution of that product at great cost to Jane Doe and other victims harmed by the Instagram product.

31.     Facebook treats its Instagram application as a mass-produced, mass-marketed product that it designs, tests, researches, builds, ships, markets, and makes widely available to the general public in the stream of commerce.

32.     Facebook has repeatedly characterized its Instagram platform as a product in regulatory filings and communications with the financial markets.  In its 2023 Annual Report filed with the United States Securities and Exchange Commission, Facebook stated that "Family" refers to its "Facebook, Instagram, Messenger, and WhatsApp products."[4]  The report identifies Instagram as part of Facebook's "Family of App Products" and refers to Instagram as a "product" throughout.[5]

33.     Facebook has repeatedly described its apps as products in other statements to public officials and users.  For example, Facebook's Mark Zuckerberg has described Facebook's apps as products in testimony before Congress.[6]

34.     Facebook likewise refers to its apps as products in customer research, branding, marketing, and internal discussions.

35.     Facebook employs "product managers" and has established a "product management team" that are responsible for the development, engineering, management, operation, and launch of its applications, including Instagram.

---

[4] *See, e.g.*, Meta Platforms, Inc., Annual Report (Form 10-K) (Feb. 2, 2024), *available at* https://investor.fb.com/financials/default.aspx.
[5] *Id.*
[6] Bloomberg Government, Transcript of Mark Zuckerberg's Senate Hearing, Washington Post (Apr. 10, 2018), https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/.

36.     Facebook has long been aware that sex trafficking and the sale of illegal sex is rampant on its products, particularly its Instagram product. Facebook's Instagram product has given sex traffickers an unrestricted platform to stalk, exploit, recruit, groom, and sell victims into human trafficking, and Instagram gives sex traffickers access to a large pool of potential victims, like Jane Doe.

37.     Facebook's products are often the first point of contact between sex traffickers and their victims, like Jane Doe.

38.     Facebook not only provides an unrestricted platform for these sex traffickers to target victims like Jane Doe, but the features of Facebook's products also cloak the traffickers with credibility. Traffickers will "friend" real acquaintances of their intended victim, thereby providing credibility to traffickers when approaching their victim through "shared" friends.

39.     Although Facebook knows of the sex trafficking problem on Instagram, and has claimed to be taking action to combat trafficking, Facebook's anti-trafficking efforts are not only nominal, but sex trafficking is intentionally ignored. Had even basic and well-recognized safety mechanisms been put in place, Jane Doe's trafficking never would have occurred.

40.     Instead of preventing human trafficking through its products, Facebook has knowingly served as a marketplace for human trafficking. Indeed, internal Facebook documents confirm its prominent role, and the role of its products—including Instagram—in organized criminal sex trafficking, as demonstrated by Facebook's "2019 Case Briefs and Insights Report" on how human traffickers and criminal networks use Facebook and its products to facilitate sex trafficking:[7]

---

[7] Justin Scheck et al., *Facebook Employees Flag Drug Cartels and Human Traffickers. The Company's Response is Weak, Documents Show*, The Wall Street Journal, https://www.wsj.com/articles/facebook-drug-cartels-human-traffickers-response-is-weak-documents-11631812953.

How FB Family of Apps were exploited/ misused

Stages of Human Trafficking Network Lifecycle

| Recruitment | Coordination | Exploitation |
|---|---|---|
| 1. Fake FB accounts<br>2. Fake IG accounts<br>3. Messenger<br>4. Search to identify other local massage parlors for women to recruit<br>5. Other websites and social media / internet presence | 1. Messenger<br>2. WhatsApp | 1. Pages for massage parlors<br>    a. Suspicious hashtags<br>2. Ads targeting men in Dubai<br>    a. Fake names sharing credit card/ad accounts<br>3. Other websites and social media / internet presence |

41.      Facebook designed, engineered, and operated its Instagram product to maximize its user base and user engagement, including when those design choices enabled sex trafficking on its Instagram product.  In fact, Facebook intentionally designed its social media products to not include common sense precautions such as age and identity verification or a meaningful mechanism to prevent traffickers from operating though fake accounts.  Facebook's design choice enables traffickers, including Jane Doe's trafficker, to adopt false identities, allowing them to pose as peers to their intended victims and to disguise their true identity from law enforcement.

42.      Likewise, Facebook designed its Instagram product to not include an adequate mechanism to report sex trafficking on the product that would have enabled Facebook to report traffickers to appropriate law enforcement authorities.  Instead, Facebook largely just directs users to call law enforcement or contact anti-trafficking organizations for resources.[8]  And even where Instagram allows a user to report inappropriate content to Facebook such that a user could

---

[8] *See   Get   Help   for   Victims   of   Human   Trafficking*,   Instagram, https://help.instagram.com/745839155428816.

theoretically report trafficking, there is no immediate response mechanism through which Facebook timely takes action. Nor does the reporting mechanism connect the user with a live Facebook employee that might be able to take immediate action. Nor does the reporting mechanism make direct reports to law enforcement about trafficking.

43.     The end result is that when users attempt to inform Facebook about human trafficking on Instagram, those reports are almost always ineffectual and do not lead to meaningful action to protect trafficking victims. Indeed, even when users attempt to report trafficking on Instagram, Facebook often does nothing with these reports and does not inform law enforcement of the known danger of traffickers on its Instagram product. Moreover, the design of Facebook's Instagram product makes reporting accounts engaged in trafficking difficult because Instagram requires a person to create an account or log into the Instagram product in order to make a report.

44.     Thus, Facebook's Instagram product lacked basic design features that would have prevented unsuspecting users from being groomed, recruited, and sold into sex trafficking by traffickers through its product.

45.     By failing to implement adequate age and identity verification procedures on its Instagram product, Facebook knowingly and foreseeably placed sex trafficking victims like Jane Doe at risk of targeting by sex traffickers, who exploit the defective design of the Instagram product. Facebook's age and identity verification procedures are inadequate because they allow a user to enter false information to create an account without requiring proof of the accuracy of the information. Further, Facebook's Instagram product is structured such that a user can create multiple accounts with different fake names and identities. Thus, the design of Facebook's Instagram product allows traffickers to adopt entirely fake identities, including posing as persons

they are not or posing as minors.  If a trafficker or buyer is faced with an issue surrounding one fake account (such as one account being banned), the trafficker or buyer can easily create another fake account to continue the illegal venture due to Facebook's inadequate verification process. As a result, the inadequate identity verification procedures on Facebook's Instagram product essentially make it impossible for Facebook to take meaningful action against traffickers and sex buyers on Instagram.

46.     Facebook has internally acknowledged that traffickers' use of fake Instagram accounts, just like Jane Doe's trafficker did, is an important part of the "human trafficking network lifecycle."[9]

47.     Because Facebook's Instagram product is designed to permit users to operate under fake accounts, Fakebook's Instagram product prevents both law enforcement and Facebook from identifying the traffickers and taking meaningful action against them.  And even if Facebook bans one Instagram account for trafficking, Instagram's design allows that trafficker to simply make another account under a different name and continue targeting unsuspecting victims, such as Jane Doe.  Accordingly, many sex traffickers operate multiple accounts with multiple fake online identities.  This design flaw prevents Facebook from taking any meaningful action against traffickers who use Instagram to recruit and sell their victims.

48.     Facebook had the technical ability to make these basic design changes to curb sex-trafficking on its Instagram product.  Indeed, Facebook can, and does, require photo identification to verify the identity of certain users, such as political advertisers:

---

[9] Justin Scheck et al., *Facebook Employees Flag Drug Cartels and Human Traffickers. The Company's Response is Weak, Documents Show*, The Wall Street Journal, https://www.wsj.com/articles/facebook-drug-cartels-human-traffickers-response-is-weak-documents-11631812953.

# What types of ID does Facebook accept?

➜ Share Article

If you need to confirm your name on Facebook, or if you've lost access to your account, you may be asked to send us a copy of something with your name on it. You have several different options for this, including photo IDs issued by the government, IDs from non-government organizations, official certificates or licenses that include your name or other physical items like a magazine subscription or a piece of mail.

In a narrow set of abuse prevention scenarios, specific forms of government-issued ID may be required. For example, users that wish to run ads with political content must confirm their identity by providing specific government-issued ID.

Learn more about what happens to your ID after you send it to Facebook.

49.    But Facebook does not require photo identification or another effective form of identity verification to prevent most users, including sex traffickers, from creating fake accounts and using Facebook's products anonymously or through fake identities.  In the alternative to photo identification, Facebook could have required other forms of identity verification, such as credit card verification or linking an account to a professional email or email from an educational institution.  But Facebook does not do so.  Nor does Facebook employ any other meaningful mechanism to prevent users from creating fake accounts.  Likewise, Facebook's Instagram product does not require any meaningful age verification—it simply asks users to self-report their birthday, but Facebook does nothing to verify the accuracy of that self-reported information.

50.    The end result of Facebook's design choices is that traffickers can use Facebook's Instagram product without providing any accurate or verifiable information about their identities, which allows traffickers to stalk their victims through a collection of fake accounts and false identities, including by masquerading as children.  Facebook's failure to implement adequate design measures to prevent users, such as Jane Doe's trafficker, from

operating through fake accounts thus facilitates traffickers' ability to manipulate and gain the trust of their victims, like Jane Doe.

51.     Facebook chooses not to implement any design changes that would provide adequate identity verification and protect against fake accounts, even though such changes are technologically feasible, used by many companies across the Internet, and could be employed at a relatively low cost considering the extreme dangers posed by fake accounts.

52.     Thus, Facebook has implemented defective product features on Instagram and has designed its Instagram product in unsafe ways—including by failing to include adequate age and identity verification and by failing to include meaningful mechanisms to prevent fake accounts—that facilitate sex traffickers in targeting and exploiting victims through Instagram.

53.     Moreover, although Facebook has long known that sex trafficking is widespread on its Instagram product, Facebook failed to include adequate warnings about the dangers of sex trafficking on its Instagram product that would have alerted its users to the danger and could have enabled users like Jane Doe to recognize the signs of sex trafficking.

54.     Facebook has the tools and resources to warn its users about the dangers of human trafficking on its Instagram product.

55.     For example, Facebook could have warned Instagram users like Jane Doe during the product registration process through warning labels, banners, or conspicuous messaging informing users about the risks of trafficking on its Instagram product—risks that were known to and foreseeable to Facebook—but Facebook chose not to include those warnings.

56.     Moreover, Facebook has detailed information about each of its users from the users' use of its platforms and from the detailed dossiers it obtains from commercial data brokers about its users, which gives Facebook information about those users engaged in trafficking and

-16-

those users who are particularly vulnerable to trafficking. Yet Facebook does not employ its technology and knowledge to warn vulnerable users like Jane Doe, or any users, about the risks of trafficking.

57.     Facebook knew or should have known that the defective design of its Instagram product attracts, enables, and facilitates sex traffickers, and sex traffickers use its Instagram product to recruit and sexually exploit other Instagram users like Jane Doe. But Facebook has not fixed the defective design of its Instagram product that facilitates sex trafficking, nor has Facebook provided adequate warnings about the known risk of human trafficking on its platform, because doing so would decrease Facebook's profits. Facebook obtains profits through users engaging with its products, collecting enormous amounts of data from those users, and utilizing that data to sell more advertising space to advertisers seeking to reach those users. But if users like Jane Doe were warned about the dangers of the product, or required to take additional steps to make an account, user engagement and membership would drop and therefore Facebook's profits would drop.[10]

58.     Facebook thus has a strong financial incentive not to warn its users like Jane Doe about human trafficking because, as Facebook has acknowledged, one of the most significant

---

[10] *See* Meta Platforms, Inc., Annual Report (Form 10-K) (Feb. 2, 2024), *available at* https://investor.fb.com/financials/default.aspx ("If we are unable to maintain or increase our user base and user engagement, particularly for our significant revenue-generating products like Facebook and Instagram, our revenue and financial results may be adversely affected. Any significant decrease in user retention, growth, or engagement could render our products less attractive to users, marketers, and developers, which is likely to have a material and adverse impact on our ability to deliver ad impressions and, accordingly, our revenue, business, financial condition, and results of operations. As the size of our active user base fluctuates in one or more markets from time to time, we will become increasingly dependent on our ability to maintain or increase levels of user engagement and monetization in order to grow revenue.").

risks to its business model is a decrease in user sentiment about its products, including because of concerns related to the safety of its products.[11]

59.     The victimization of Instagram users like Jane Doe by sex traffickers is the direct and foreseeable result of Facebook's design decisions and refusal to implement adequate warnings about the dangers of sex trafficking on Instagram.  Facebook has long been aware of the prevalence of sex trafficking on its Instagram product and the contribution that its design decisions have made to enable trafficking on Instagram but has failed to take adequate measures to address these problems.

60.     Facebook was in a superior position to control the risk of harm of sex trafficking on its Instagram product and alter the design of its product to make it more safe.

61.     Instagram users, including Jane Doe, do not have knowledge about how the Instagram product is defectively designed, and could not have learned about those defects or the harms that flow from them by inspecting the product before using it.  Further, Facebook knew and intended that the Instagram product would be downloaded by members of the public and used by the public without inspection for defects.

62.     Further, Facebook actively assists and ventures with the sex traffickers who operate through its products. Facebook plays an integral role in facilitating online sex trafficking by providing and maintaining the Instagram product in a manner that enables sex traffickers to sell their victims.

63.     Instagram is responsible for creating many of the connections between victims, traffickers, and sex buyers that lead to the ultimate sale of victims like Jane Doe through Instagram.

---

[11] *Id.*

-18-

64.     Facebook collects data on its users' activities through its products, including information about their contacts, group associations, and the content that its users post and interact with. Facebook collects and buys detailed information about its users so that it can, among other things, direct users to persons that Facebook thinks they likely want to meet. By employing proprietary algorithms, Facebook's products generate targeted recommendations to its users, including recommendations about other users they should know.

65.     This technology, however, has served to create connections between sex traffickers and their victims that otherwise would never have existed. Facebook's Instagram product promotes and facilitates connections between sex traffickers and their victims, connections which provide sex traffickers with a steady stream of victims, like Jane Doe, to be sold through Instagram.  In doing so, Facebook facilitates human trafficking by identifying potential victims, like Jane Doe, and connecting traffickers with those individuals.

66.     Facebook knows that it provides a critical link in the sex trafficking chain, and benefits from doing so through selling advertisements on pages that promote sex trafficking and sell sex trafficking victims.

67.     Further, Facebook knows that it increases user engagement and time spent on its products like Instagram—thereby increasing advertising revenue—when it promotes and facilitates connections between all parties involved in sex trafficking operations ran through Instagram (e.g., traffickers, persons who recruit victims into sex trafficking, sex buyers, and the victims themselves).

**C.   Jane Doe (K.B.) was trafficked and publicly sold for sex on Instagram.**

68.     Jane Doe was an Instagram user who used the Instagram product for its intended purpose as a social media application.

69.     In July 2017, Jane Doe was contacted on Instagram by R.L., a man who was previously unknown to her and had no relationship to her.

70.     Facebook did not require R.L. to provide or verify his true identity, and Facebook took no steps to verify his identity.

71.     R.L. began to send messages to Jane Doe through Instagram's direct message chat feature and posted statements to Jane Doe on her public Instagram screen. R.L.'s messages and public posts on Instagram employed recognized grooming techniques that traffickers often use to lure victims.

72.     R.L. continued sending direct messages to Jane Doe and making public posts on her Instagram page in order to gain her trust. Eventually, R.L. suggested that Jane Doe meet him in person.

73.     Within two days of their first in person meeting, R.L. began to traffic Jane Doe for sex on Instagram. R.L. promised Jane Doe that, if she worked for him, they would be in a relationship, they would live lavishly, and they would start a family.

74.     Shortly after R.L. and Jane Doe met, R.L. publicly posted photos of Jane Doe on Instagram.  The postings publicly and obviously advertised Jane Doe for sale for sex.

75.     The advertisements contained photos of Jane Doe with another victim posing suggestively in a hotel bathroom. Jane Doe's photos were posted alongside several other victims, all of whom were publicly being sold for sex.

76.     The postings on Instagram through which Jane Doe was sold contained obvious signs of human trafficking that would be easily recognizable by law enforcement and trafficking experts. For example, the posts advertising Jane Doe for sale contained emoticons of dollar signs, crowns, and roses, which are well-known code conveying that the person pictured is being sold for sex. Additionally, the advertisements include other signs of trafficking, including the use of emojis such as lips, squirting water, and currency that are known to Facebook as indications of the selling of sex and sex trafficking. Facebook knew that the use of this code was a blatant red flag that the posts involving Jane Doe were actually sex trafficking advertisements designed to sell her for sex.

77.     In fact, Facebook was aware of the signs of trafficking and the sale of victims as early as 2012 and circulated internal communications documenting these issues. At the time of Jane Doe's trafficking, Facebook was well aware that sex trafficking was a rampant problem on its Instagram platform.

78.     Facebook knew that Jane Doe was an Instagram user. And Facebook knew that Jane Doe was being trafficked and sold for sex through Instagram because the postings selling her for sex were on Facebook's Instagram product and were public, open, and obvious and contained unmistakable evidence of human trafficking as described above.

79.     Even though Jane Doe and other victims were being openly sold for sex on Instagram, Facebook allowed the sales to continue unabated on its Instagram platform because taking action to limit its customers' ability to use its products for trafficking would decrease user engagement with Instagram, engagement with advertisements, the amount of data Facebook can collect, and Facebook's profits.

80. In response to the advertisements openly selling Jane Doe for sex on Instagram, sex buyers contacted R.L. about Jane Doe through Instagram. R.L. then forced or coerced Jane Doe to perform sex acts in exchange for money from those sex buyers.

81. R.L. told Jane Doe that if she did not meet sex buyers and make enough money to meet his quota, she would be prohibited from returning home and would have to stay on the street until she met her quota.

82. R.L. threatened to beat Jane Doe if she did not participate fully in his sex trafficking enterprise.

83. Between July 2017 to July 2018, Jane Doe was repeatedly sold for unlawful sex acts through Instagram in Houston, Texas and was assaulted by numerous men.

84. At all times, the advertisement and trafficking of Jane Doe was openly executed through Instagram.

85. Jane Doe suffered significant physical and emotional injuries as a result of the trafficking complained of herein, injuries that are long-lasting or life-long.

86. Jane Doe ultimately testified against R.L. in a federal criminal trial in the Southern District of Texas, where R.L. was convicted of sex trafficking crimes and sentenced to 40 years in prison.

87. As of the filing of this complaint, even with the Instagram of the trafficker being subpoenaed and used in the criminal trial and the trafficker being in prison for several years, Instagram has not removed the trafficker's Instagram.

**D.   Facebook's misconduct and the defective and inadequate design of its Instagram product caused Jane Doe's trafficking and injury.**

88. The trafficking of Jane Doe was made possible and facilitated by Facebook, who directly profited from her trafficking, and by Facebook's technology and Instagram product.

89.     Facebook's Instagram product formed an integral part of the illegal enterprise through which Jane Doe was trafficked. Facebook's actions thereby facilitated and caused the trafficking of Jane Doe through its Instagram product.

90.     Facebook has not taken reasonable steps to mitigate sex trafficking on its Instagram product.

91.     Facebook intentionally designed its social media products, including Instagram, to not include reasonable age and identity verification systems, allowing users to create accounts anonymously and adopt fake personas as they interact with other unsuspecting users.

92.     Facebook knows fake user accounts are commonly used by sex traffickers and has acknowledged this problem in internal documents. Facebook allows users, like Jane Doe's trafficker, to create fake accounts—and does not implement adequate age and identity verification procedures or other mechanisms to prevent the creation of fake accounts—because Facebook knows that doing so will discourage people from using its products and will result in revenue loss.

93.     Jane Doe's trafficker's Instagram account was under a fictious name. All of the advertising accounts used to sell Jane Doe for sex were fake user accounts.

94.     Facebook's decision to design its social media products to not include reasonable identity verification directly enabled R.L. to create a fake profile and adopt a false persona, which in turn allowed R.L. to gain Jane Doe's trust and ultimately groom, recruit, and sell her into sex trafficking. Facebook's decision to design its products without identity verification directly created a dangerous environment for unsuspecting users such as Jane Doe by exposing her to interactions with traffickers who were able to operate freely and anonymously on Facebook's platforms.

-23-

95.     Facebook intentionally designed its social media products, including Instagram, to not include a reasonable reporting tool by which a user could report sex trafficking on its products, which would have allowed Facebook to take remedial action such as reporting the sex traffickers to law enforcement.  And even where Instagram allows a user to report inappropriate content to Facebook such that a user could theoretically report trafficking, there is no immediate response mechanism through which Facebook timely takes action.  As a result, when users attempt to inform Facebook about human trafficking on Instagram, those reports are almost always ineffectual and do not lead to meaningful action to protect trafficking victims.  Indeed, even when users attempt to report trafficking on Instagram, Facebook often does nothing with these reports and does not inform law enforcement of the known danger of traffickers on its Instagram product.  Moreover, the design of Facebook's Instagram product makes reporting accounts engaged in trafficking difficult because Instagram requires a person to create an account or log into the Instagram product in order to make a report.

96.     Facebook, as the manufacturer and distributor of the Instagram product, had a duty to its users to design a reasonably safe product. Facebook could have easily fulfilled this duty without altering, deleting, or modifying the contents of any third-party post, message, or other communication.  Facebook could have fulfilled its duty by, for example, modifying the design of its products to require adequate age and identity verification for its users or other mechanisms such that users could not operate under fake accounts or modifying the design of its products to include adequate features for reporting sex trafficking.  But Facebook failed to do so.

97.     In addition to the design defects in its Instagram product, Facebook did not provide adequate warnings to users, including Jane Doe, of the danger posed by the presence of

traffickers on its social media products, or of the danger that a trafficker may attempt to groom and recruit an unsuspecting victim by means of a fake or false account, even though these dangers were known and foreseeable to Facebook.

98.     Facebook did not provide adequate warnings to users, like Jane Doe, who Facebook knew were interacting with persons known to engage in trafficking.

99.     Jane Doe was never made aware of the danger of sex traffickers on Instagram and was never informed of the warning signs of sex trafficking. Had she been warned, her trafficking would never have happened.

100.    Facebook had a duty to furnish adequate warnings of known and foreseeable dangers arising out of the use of their products. Facebook could have easily fulfilled this duty without altering, deleting, or modifying the contents of any third-party post, message, or other communication. Facebook could have fulfilled its duty by, for example, providing warnings regarding the dangers of sex trafficking on its products that were known to Facebook, the particular risks associated with strangers using fake accounts, and the recognized signs of human trafficking.

101.    Jane Doe's injuries were proximately caused by the design defects in Facebook's Instagram product, and the design defects in Facebook's Instagram product were a substantial factor in causing harm to Jane Doe. If Facebook's Instagram product had not been defectively designed and had included adequate identify verification procedures and adequate mechanisms to prevent fake accounts, R.L. would not have been able to make a fake account through which he lured and entrapped Jane Doe into sex trafficking. If Facebook's Instagram product had not been defectively designed and had included adequate procedures to report sex trafficking on Facebook's Instagram product that required Facebook to take timely action in response to a

report, R.L.'s trafficking scheme would have been reported to Facebook, and Facebook could have reported R.L.'s trafficking enterprise to law enforcement and enabled law enforcement to take action against R.L. before he had the opportunity to entrap Jane Doe and subject her to sex trafficking.

102.    Likewise, Jane Doe's injuries were proximately caused by Facebook's failure to provide adequate warnings of the danger of human trafficking on its Instagram product that was known and foreseeable to Facebook, and Facebook's failure to provide adequate warnings about the dangers of human trafficking on Instagram were a substantial factor in causing harm to Jane Doe.  If Facebook had provided adequate warnings regarding the dangers of sex trafficking on its Instagram product, Jane Doe would have been able to protect herself from trafficking because she would have heeded those warnings and would have been aware of the dangers of trafficking on Instagram and of the well-recognized signs of human trafficking exhibited by R.L.  If Facebook had provided adequate warnings regarding the dangers of sex trafficking on its Instagram product, Jane Doe would have been on alert to avoid trafficking on Instagram, and would have in fact avoided falling victim to and being trafficked by R.L.  Thus, if Jane Doe had received adequate warnings that had informed her about the dangers of sex trafficking on Instagram and the warning signs of sex trafficking, Jane Doe would not have been in a position to be raped, abused, and trafficked.  But because Jane Doe was not provided with adequate warnings regarding human trafficking on Instagram, she was unaware of the dangers of trafficking and was unable to recognize the signs of human trafficking and could not take the steps she otherwise would have taken to avoid trafficking on Instagram. As a result, Jane Doe became entrapped in R.L.'s trafficking scheme and suffered severe injuries.

## VII.   CAUSES OF ACTION AGAINST FACEBOOK

### COUNT 1: VIOLATION OF 18 U.S.C. § 1595

103.    Jane Doe incorporates each foregoing allegation.

104.    Jane Doe is a victim of sex trafficking under 18 U.S.C. §§ 1591 and 1595, as she was forced or coerced into performing commercial sex acts. Jane Doe's trafficker, R.L., was convicted of sex trafficking crimes.

105.    Facebook violated the civil anti-trafficking statute under 18 U.S.C. § 1595(a), which provides that:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

106.    Thus, to bring a civil claim under Section 1595, the defendant must have knowingly benefitted from participating in a venture which that person knew or should have known was engaged in an act in "violation of this chapter."

107.    The relevant "violation of this chapter" by the venture in this case is a violation of the criminal anti-trafficking provision found in 18 U.S.C. § 1591, which states:

> (a) Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the

-27-

person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

108.   Facebook had a duty not to knowingly benefit from trafficking of persons, including Jane Doe.

109.   Facebook breached this duty by knowingly receiving financial benefits from facilitating the sex trafficking of Jane Doe and others through Instagram, including by:

    a.    Creating and maintaining a breeding ground for sex trafficking and the sale of illegal sex on Instagram, knowing of the prevalence of trafficking on Instagram;

    b.    Knowingly assisting and facilitating sex traffickers in connecting with their intended victims and in selling and advertising their victims through Facebook's Instagram product, including facilitating the sale of Jane Doe;

    c.    Providing a marketplace through Instagram for the sale of sex trafficking victims online;

    d.    Enabling the sale of Jane Doe through the Instagram platform, which played an integral and necessary role in her trafficking and injury;

    e.    Providing products and features through Instagram that facilitate the sale and advertisement of sex trafficking victims online;

    f.    Creating, suggesting, and encouraging connections between sex traffickers and vulnerable persons on Instagram, effectively creating a pipeline of victims to be sold for sex by traffickers on Instagram;

    g.    Recommending that vulnerable persons become Instagram "friends" with sex traffickers;

    h.    Raising advertising fees by extending its "user base" to include sex traffickers;

    i.    Maximizing user engagement, user numbers, advertising revenue, and profits by allowing sex traffickers to use Instagram as a forum to sell their victims;

    j.    Participating in a venture that trafficked Jane Doe and others through helping traffickers connect with, advertise, and sell trafficking victims on Facebook's Instagram product;

    k.    Permitting the open and obvious human trafficking of Jane Doe and other victims, whose trafficking was occurring publicly on Facebook's own product;

l.   Failing to ban sex traffickers from using and posting on Instagram, despite knowing that the content of the traffickers' posts involved the sale of victims for sex;

m.   Increasing profit margins as a result of continued customer loyalty and therefore increased "user" numbers used to extract higher advertiser fees by creating a breeding ground for sex traffickers to stalk and entrap survivors;

n.   Increasing profit margins and lowering operating costs by failing to take any reasonable steps to abate human trafficking on its platforms, including

1.   not implementing safeguards requiring verification of the identity of all user's on Instagram;

2.   not using advertising space for public service announcements or awareness campaigns regarding the dangers of entrapment, grooming, and recruiting methods used by sex traffickers on Instagram

3.   not implementing mandatory public service announcements for those who sign up for Instagram regarding the dangers of entrapment and grooming used by sex traffickers on Instagram;

110.   Facebook has knowingly received significant benefits as a result of these acts and omissions to facilitate the sale of sex trafficking victims through Instagram. By allowing Instagram to operate as a breeding ground for sex trafficking, Facebook increased the user base of Instagram and increased its advertising revenue as sex traffickers use Instagram to sell victims and sex buyers visit Instagram to purchase persons for sale. Facebook's profit model stems from advertising and thus the maintenance and growth of its user base is critical to Facebook's ability to continue to profit.

111.   Facebook knew, or at minimum should have known, that the sex traffickers using its platform were engaged in criminal trafficking activity and that it was actively assisting those traffickers by helping them connect with victims and providing a marketplace for them to advertise and sell their victims.

-29-

112.    Facebook knew, because it was posted publicly on Facebook's own Instagram product, that Jane Doe and other victims were being trafficked through the product and were being openly sold for sex on the product.

113.    Facebook therefore had actual and constructive knowledge of a venture involving violations of human trafficking laws operating through Instagram.

114.    The evidence in this case will show that, without the technology that Facebook provided to traffickers through its Instagram product and associated features, the ability of traffickers to effectively sell their victims (including Jane Doe) would have been destroyed or, at minimum, severely diminished.

115.    At all points, Facebook chose to maximize profits, to facilitate trafficking through Instagram, and to turn a blind eye to the human trafficking victims whose sexual exploitation began on Instagram, including Jane Doe.

## COUNT 2: STRICT PRODUCT LIABILITY—DESIGN DEFECT

116.    Jane Doe realleges and incorporates by reference each and every preceding and succeeding paragraph as though set forth fully at length herein.

117.    Instagram is a social media product, Facebook has repeatedly acknowledged that Instagram is a product, and Facebook identifies Instagram as a product in its 10-K filings with the SEC.[12]

118.    Facebook is the designer, manufacturer, developer, manager, operator, distributor, formulator, constructor, and producer of the Instagram product, and Facebook marketed and put the Instagram product into the stream of commerce and benefitted from its Instagram product being used by Jane Doe, a foreseeable user of the Instagram product.

---

[12] *See, e.g.*, Meta Platforms, Inc., Annual Report (Form 10-K) (Feb. 2, 2024), *available at* https://investor.fb.com/financials/default.aspx.

119.     Facebook's Instagram product is distributed and sold to the public through retail channels such as the Apple App Store and Google Play Store.

120.     Facebook markets and advertises its Instagram product to the public for personal use of end-users/consumers like Jane Doe.

121.     Jane Doe was a user of Facebook's Instagram product, and used the product in the manner in which it was intended by Facebook or in reasonably foreseeable ways as a social media application.

122.     Under California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

123.     Facebook, as the manufacturer, designer, and distributor of the Instagram product, owed a duty to users like Jane Doe to design a non-defective product that does not pose an unreasonable risk of injury or harm to its users.

124.     Facebook's Instagram product is defective in design and poses a substantial likelihood of harm to its users for the reasons explained herein because the product fails to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.  Ordinary consumers of the Instagram product do not expect that the design of Facebook's Instagram product will put them at great risk of being subject to sex trafficking.

125.     Facebook's Instagram product is defectively designed in a way that is unsafe and creates an inherent risk of danger from sex trafficking.  Facebook defectively designed its

-31-

Instagram product in a way that facilitated human trafficking on its platforms and put vulnerable users at risk of being subject to human trafficking in order to maximize its user engagement, data collection, and profits from advertising.

126.   Although Facebook built and distributed the Instagram product as intended in accordance with its intended specifications, the design of the Instagram product was inherently defective.  The defects in the design of the Instagram product existed prior to the release of the product to Jane Doe and to the public, including Jane Doe's trafficker and the buyers who paid for sex with Jane Doe, and there was no substantial change to the Instagram product between the time of its upload to public or retail channels like the App Store or Google Play and the time of its distribution to Jane Doe via download or other access.  Facebook's Instagram product was defective and unreasonably dangerous when it left Facebook's possession and control.  The defects continued throughout the products' distribution and use by consumers, including Jane Doe.

127.   Jane Doe, her trafficker, and buyers used the Instagram product in reasonably foreseeable ways, and Jane Doe's injury resulted from these reasonably foreseeable uses of the product.

128.   Facebook knew or should have known that Jane Doe would not or could not inspect its Instagram product in a way that could reveal the danger of human trafficking posed by the product.  The dangers of human trafficking posed by Facebook's Instagram product are not immediately apparent from the use of the product.

129.   Facebook's products were unreasonably dangerous because they contained numerous design characteristics that were not necessary for the utility provided to the user but

Plaintiff's Third Amended Complaint
Case No. 23-CV-02387-RFL

were unreasonably dangerous and implemented by Facebook solely to increase the profits it derived from each additional user.

130.   Facebook designed, manufactured, marketed, and sold its Instagram product in an unreasonably dangerous condition because it did not include adequate identity verification or mechanisms to prevent users from creating fake accounts.  Facebook's Instagram product was designed to allow individuals, including traffickers, to create fake profiles and adopt false personas with which they could interact with other users and evade law enforcement, enabling them to conceal their true identity from unsuspecting victims and groom, recruit, and sell unsuspecting victims into sex trafficking.   An ordinary consumer would not expect that Facebook's Instagram product would be designed to facilitate sex traffickers' illegal activities by allowing them to operate through false identities and fake accounts.

131.   Thus, as designed, Facebook's products are not reasonably safe because they do not provide for adequate age and identity verification by requiring users to document and verify their age and identity.

132.   As designed, Facebook's Instagram product is not reasonably safe because it does not contain adequate mechanisms to prevent users from creating fake accounts that conceal or misrepresent the true identity of the user.

133.   Additionally, as designed, Facebook's products are not reasonably safe because they do not provide a reasonable tool by which to report sex trafficking on Facebook's products so that Facebook could take appropriate remedial action, including reporting the traffickers to appropriate law enforcement.

134.   These defects, among others, existed at the time that Jane Doe used the Instagram product.

135.   Although Facebook knew about the dangers posed by the defects in its Instagram product, Facebook failed to remedy these defects prior to distributing the Instagram product to Jane Doe.

136.   Traffickers frequently set up user accounts on Facebook's social media products under false names and personas in order to groom unsuspecting victims, gain their trust, and ultimately force them into sex trafficking.

137.   Users of Facebook do not reasonably expect that Facebook's Instagram product will be designed to allow individuals and traffickers to set up fraudulent accounts on Facebook's social media products in order to groom, recruit, and advertise victims for sex trafficking.

138.   The design of Facebook's Instagram product created an excessive preventable danger of subjecting Instagram users, including Jane Doe, to sex trafficking.  The risks inherent in the design of Facebook's Instagram product significantly outweigh any benefit or utility of such design.

139.   The design of Facebook's Instagram product created a high likelihood that Instagram users would be subject to sex trafficking, and the gravity of harm caused by sex trafficking is extremely high in terms of the long-lasting or permanent physical and emotional toll on trafficking victims.  And the burden on Facebook to adopt precautions in Instagram's design that would have been effective against sex trafficking was minor in comparison.

140.   Facebook could have utilized cost-effective, reasonably feasible alternative designs for its Instagram product that are already used by many companies across the internet and that would minimize the risk of trafficking on Instagram, including robust age and identity verification tools that require users to submit a photo identification or other reliable form of identification, mechanisms to prevent persons from creating fake accounts using unverified

identifies, and improved mechanisms for reporting of human trafficking such as a reporting mechanism that would require Facebook to take timely action, a reporting mechanism that would not require users to log in or create an account to report trafficking, or a mechanism that would allow a user to connect with a Facebook employee in real time to report an imminent danger of sex trafficking.  Reasonably accurate age and identify verification procedures and tools to report trafficking are not only feasible and cost-effective, but are widely deployed by on-line retailers and other technology companies marketing products comparable to Facebook's products.

141.    The cost of incorporating adequate age and identify verification and reporting tools into Facebook's products would be negligible whereas the benefit of age and identity verification and reporting tools would be a substantial reduction in severe mental health harms, physical injury, sexual assault, and sex trafficking among users of Facebook's products.

142.    The alternative design of Facebook's Instagram product with adequate age and identity verification, mechanisms to prevent fake accounts, and adequate reporting mechanisms for sex trafficking would have minimized the danger of sex trafficking on Instagram while allowing the Instagram product to continue to serve its basic purpose as a social media application.

143.    Jane Doe's severe injuries as a victim of sex trafficking were the foreseeable result of Facebook's defective design of its Instagram product—which allowed sex traffickers to use Instagram without properly verifying their identity, which allowed sex traffickers to operate under fake accounts with false identities that facilitated their efforts to entrap vulnerable victims, and which prevented effective reporting of sex trafficking on its Instagram product.

144.    Jane Doe's injuries were the proximate result of the defects discussed above, among others.

145.    Jane Doe's injuries were directly and proximately caused by Facebook's defective design of its social media products in failing to include adequate identify verification and mechanisms to prevent fake accounts.  This design defect was a substantial factor in causing harm to Jane Doe. If Facebook's Instagram product had not been defectively designed with inadequate identity verification procedures and inadequate mechanisms to prevent fake accounts, R.L. would not have been able to make a fake account through which he trafficked Jane Doe.  Jane Doe would not have been subject to trafficking and injury if R.L. had been required to verify his true identity to create an account rather than being permitted to operate in disguise through a fake account.

146.    Jane Doe's injuries were also directly and proximately caused by Facebook's defective design of its social media products in failing to include adequate mechanisms to report human trafficking.  This design defect was a substantial factor in causing harm to Jane Doe.  If Facebook's Instagram product had not been defectively designed and had included adequate procedures to report sex trafficking on Facebook's Instagram product that required Facebook to take timely action, R.L.'s trafficking scheme would have been reported to Facebook, and Facebook could have reported R.L.'s trafficking enterprise to law enforcement and enabled law enforcement to take action against R.L. before he had the opportunity to entrap Jane Doe and subject her to sex trafficking.  Moreover, if Instagram's reporting mechanisms had not been defectively designed so as to make reporting more difficult—including because Instagram's reporting mechanisms are only usable if a person logs into Instagram or creates an account—then the trafficking on R.L.'s account would have been reported to Facebook and Facebook could have taken appropriate action, including by reporting R.L. to law enforcement.  Further, if Facebook's reporting mechanism had been designed to immediately connect the user with a

live Facebook employee to report human trafficking—rather than allowing a user to submit a report into a void where Facebook rarely takes any action against traffickers and rarely reports trafficking to law enforcement—Facebook could have taken prompt action against R.L. Similarly, Facebook could have designed a reporting mechanism that contained a "panic button" that would allow the user to immediately and directly report trafficking to authorities to take action against R.L.

147.   The injuries Jane Doe suffered were reasonably foreseeable to Facebook at the time that Instagram was developed, designed, advertised, marketed, promoted, and distributed.

148.   As a result of Facebook's defective design of its social media products, Jane Doe was groomed, recruited, and sold into sex trafficking, leading to physical and mental injury from her use of Facebook's Instagram product.

149.   As a result of the injuries Facebook caused to Jane Doe, Jane Doe has required and will continue to require additional healthcare, medical, incidental, and other related expenses.

150.   Facebook's conduct—including the conduct of its officers, directors, and managing agents—was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displays a want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health and safety of its consumers, and warrants an award of punitive damages sufficient to punish Facebook and deter other companies from similar conduct.  Although Facebook and its officers, directors, and managing agents knew that its Instagram product was defective and dangerous in the ways described herein (among others), and knew that because of those defects Instagram could not be used safely for its intended purpose as a social media application, Facebook nonetheless placed

-37-

Instagram on the market willfully, maliciously, and in conscious disregard of the danger to the safety of the public posed by the product.

### COUNT 3: STRICT PRODUCT LIABILITY—FAILURE TO WARN

151.    Jane Doe realleges and incorporates by reference each and every preceding and succeeding paragraph as though set forth fully at length herein.

152.    Instagram is a social media product, Facebook has repeatedly acknowledged that Instagram is a product, and Facebook identifies Instagram as a product in its 10-K filings with the SEC.[13]

153.    Facebook is the designer, manufacturer, developer, manager, operator, distributor, formulator, constructor, and producer of the Instagram product, and Facebook marketed and put the Instagram product into the stream of commerce and benefitted from its Instagram product being used by Jane Doe, a foreseeable user of the Instagram product.

154.    Facebook's Instagram product is distributed and sold to the public through retail channels such as the Apple App Store and Google Play Store.

155.    Facebook markets and advertises its Instagram product to the public for personal use of end-users/consumers like Jane Doe.

156.    Jane Doe, her trafficker, and the sex buyers who assaulted her used Facebook's Instagram product in reasonably foreseeable ways, and Jane Doe's injury resulted from these reasonably foreseeable uses of the product.

157.    The magnitude of harm from being forced into sex trafficking through Facebook's products, whether from being groomed, recruited, or advertised for commercial sex,

---

[13] *See, e.g.*, Meta Platforms, Inc., Annual Report (Form 10-K) (Feb. 2, 2024), *available at* https://investor.fb.com/financials/default.aspx.

is enormous, commonly including physical injury, mental and emotional injury, sexual abuse, and exploitation.

158.   The harms resulting from sex trafficking contained on Facebook's products was well documented by the press, law enforcement, scientific literature, and state and federal legislatures across the country, and Facebook had actual knowledge of such harms.   Thus, Facebook knew (or, at minimum, should have known) that the Instagram product posed a risk of harm from sex trafficking based on external information and its own internal studies and knowledge of its products at the time of development, design, marketing, promotion, advertising, and distribution of the Instagram product.   Accordingly, the risk of sex trafficking through the Instagram product was known and knowable to Facebook in light of generally prevailing scientific, medical, and technical knowledge that was available at the time of the manufacture and distribution of Facebook's Instagram product.

159.   Facebook sold and distributed its Instagram product in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of sex trafficking on Instagram as described herein, which rendered the product unsafe for its intended or reasonably foreseeable uses.   The Instagram product was dangerous to an extent beyond that contemplated by the ordinary user due to the high risk of sex trafficking on the product.

160.   Under California law, Facebook had a duty to warn Jane Doe about the known dangers of sex trafficking on its Instagram product.

161.   Facebook did not warn Jane Doe about the dangers of sex trafficking or otherwise implement awareness campaigns to inform the users of its Instagram product about the dangers of trafficking on Instagram and the indicia of human trafficking or grooming behavior.

162.    Facebook's Instagram product is unreasonably dangerous because it lacks any warnings that sex trafficking is rampant on Facebook's platforms, or that foreseeable product use included interactions with traffickers who could seek to groom, recruit, and sell an unsuspecting user into sex trafficking.  Likewise, Facebook's products do not contain warnings that Facebook allows users to make fake accounts, and therefore a victim may be approached by sex traffickers operating under fake accounts and false identities.

163.    Facebook knew about these harms, knew that users would not be able to safely use its products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by its users.  Facebook knew or had reason to believe that users of Instagram would not realize the dangers of sex trafficking created by the product.

164.    Facebook could have satisfied its duty by providing the customers who use its products with warnings about the dangers of sex trafficking on the Instagram product and the warning signs/indicia of sex trafficking through various different means, including by posting warnings to users' feeds, using advertising space for public service announcements regarding the dangers and signs of trafficking, or requiring users to read warnings about the danger of trafficking in order to make an account.  But Facebook did not take these simple, cost-effective steps.

165.    An ordinary user would not have recognized the potential risks of trafficking on the Instagram product when used in a manner reasonably foreseeable to Facebook, and the risk of trafficking on Instagram was not known by Jane Doe or obvious to her.

Plaintiff's Third Amended Complaint
Case No. 23-CV-02387-RFL

166.   Jane Doe's severe injuries as a victim of sex trafficking were the foreseeable result of Facebook's failure to provide adequate warnings to make Jane Doe and other users aware of the risks and signs of sex trafficking.

167.   Jane Doe's injuries were directly and proximately caused by Facebook's failure to provide adequate warnings of the dangers of trafficking on its platforms, including Instagram. Facebook's failure to provide adequate warnings of the dangers of trafficking on its platforms was a substantial factor in causing the injuries sustained by Jane Doe.  If Facebook had provided adequate warnings regarding the dangers of sex trafficking on its Instagram product, Jane Doe would have been on alert to avoid trafficking on Instagram.  If Facebook had provided adequate warnings of the dangers of trafficking on its platforms, Jane Doe would have heeded those warnings, would have been able to recognize the established signs of trafficking on Instagram, and would have avoided being trafficked through Instagram.  But because Jane Doe was not provided with warnings regarding human trafficking on Instagram, she was unaware of the dangers of trafficking and was unable to recognize the signs of human trafficking and could not take the steps she otherwise would have taken to avoid trafficking on Instagram.  Thus, Jane Doe became entrapped in R.L.'s trafficking scheme.  As a result of Facebook's failure to warn, Jane Doe was trafficked, and has suffered serious damages in the form of physical injury, emotional distress, medical expenses, and loss of income and earning capacity from her use of Facebook's Instagram product.

168.   As a result of the injuries Facebook caused to Jane Doe, she will continue to require additional healthcare, medical, incidental, and other related expenses in the future.

169.   Facebook's conduct and the conduct of its officers, directors, and managing agents in failing to warn of the danger of sex trafficking posed by its Instagram product—despite

-41-

their knowledge of the risk—was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displays a want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health and safety of its consumers, and warrants an award of punitive damages sufficient to punish Facebook and deter other companies from similar conduct.

170.    Thus, Facebook is further liable to Jane Doe for punitive damages based upon its willful, wanton, oppressive, malicious, and fraudulent failure to warn of the dangers of sex trafficking on its Instagram product, which Facebook intentionally marketed and sold to users who it knew would likely be seriously harmed through their use of Instagram.

### COUNT 4: NEGLIGENCE—DESIGN

171.    Jane Doe realleges and incorporates by reference each and every preceding and succeeding paragraph as though set forth fully at length herein.

172.    Instagram is a social media product, Facebook has repeatedly acknowledged that Instagram is a product, and Facebook identifies Instagram as a product in its 10-K filings with the SEC.[14]

173.    Facebook is the designer, manufacturer, developer, manager, operator, distributor, formulator, constructor, and producer of the Instagram product, and Facebook marketed and put the Instagram product into the stream of commerce and benefitted from its Instagram product being used by Jane Doe, a foreseeable user of the Instagram product.

174.    Facebook's Instagram product is distributed and sold to the public through retail channels such as the Apple App Store and Google Play Store.

---

[14] *See, e.g.*, Meta Platforms, Inc., Annual Report (Form 10-K) (Feb. 2, 2024), *available at* https://investor.fb.com/financials/default.aspx.

175.     Facebook markets and advertises its Instagram product to the public for personal use of end-users/consumers like Jane Doe.

176.     Jane Doe was a user of Facebook's Instagram product, and used the product in the manner in which it was intended by Facebook or in reasonably foreseeable ways.  The defects in the design of Facebook's Instagram product and the risks of using the product were not immediately apparent from using the Instagram product or independently verifiable by Jane Doe.

177.     At all relevant times, California law imposed on Facebook a duty to exercise reasonable care and caution for the safety of individuals using its products, such as Jane Doe.

178.     Facebook owed a general duty to exercise ordinary care in its actions, and specifically owed a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its products.  Facebook owed a duty to all reasonably foreseeable users to design a safe product in its Instagram product.  As the manufacturer and distributor of the Instagram product, Facebook owed a duty to users like Jane Doe to design a non-defective product that does not pose an unreasonable risk of injury or harm to its users.

179.     As business owners, Facebook owes its users—who use Facebook's social media products and from whom Facebook derives billions of dollars per year in advertising revenue—a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees. Facebook has acknowledged that it considers itself to be a digital premises owner by changing its name to Meta, in reference to the "metaverse," and likening its platforms to physical places where it intends for its users to visit for Facebook's financial gain.

180.    Facebook was negligent, grossly negligent, reckless, and/or careless in that it failed to exercise ordinary care and caution for the safety of users, like Jane Doe, using its Facebook and Instagram products.

181.    Facebook knew, or should have known through the exercise of reasonable care, of the risk of human trafficking posed by its Instagram product, which carries with it a risk of severe physical and emotional injuries.  Facebook knew, or should have known through the exercise of reasonable care, that ordinary consumers like Jane Doe would not have realized the potential risks and danger of human trafficking on Facebook's Instagram product.

182.    Facebook's Instagram product was defectively designed, and the defects were due to Facebook's own negligence.  Facebook breached its duty of care in failing to use reasonable care in the design of its Instagram product by negligently designing the product with features that magnified the risk of human trafficking or without features that could have decreased the risk of human trafficking to Instagram users.  Facebook breached its duty of care by designing its Instagram product in a way that was less safe than an ordinary consumer would have expected when using the product in an intended and reasonably foreseeable manner.  Facebook breached its duty of care by placing the defective Instagram product into the stream of commerce when it either knew or should have known of its defective nature and potential to harm members of the general public, including Jane Doe.

183.    Facebook was negligent and breached its duty to use reasonable care in failing to implement meaningful age and identity verification tools to require users to document and verify their age and identity.  Facebook did not use reasonable care to verify the identity of users on its Instagram product.  Likewise, Facebook failed to implement adequate mechanisms to prevent

users from creating fake accounts and using false identities that facilitated sex traffickers' ability to approach and entrap unsuspecting victims like Jane Doe.

184.   Facebook knew of the risk of trafficking posed by its Instagram product, and Facebook knew that the design of its product with inadequate age and identity verification and the absence of other mechanisms to prevent fake accounts created a risk that traffickers could use fake accounts to entrap and traffic unsuspecting victims with anonymity.   Thus, Facebook knew at all relevant times as it was designing and marketing its Instagram product, or should have known by the exercise of reasonable care, that its Instagram product was dangerous, harmful, and injurious when used in a reasonably foreseeable manner because the product posed a risk of harm from sex trafficking.

185.   Facebook was also negligent and breached its duty to use reasonable care in failing to implement a reasonable tool through which users could report sex trafficking on its products, to alert Facebook to traffickers using its products and to enable Facebook to take appropriate action, including by report incidents of sex trafficking to appropriate law enforcement authorities.   Facebook could have adopted a reasonable alternative design for its reporting tool—such as a tool that requires Facebook to take immediate action upon receiving a report of human trafficking, a reporting tool that can be utilized without requiring persons to log in or create an Instagram account, a reporting tool that immediately connects the user with a live Facebook employee, or a reporting tool with a "panic button" that allows users to immediately and directly alert authorities to trafficking.

186.   These defects existed at the time that Jane Doe used the Instagram product.

187.   The design of Facebook's Instagram product created a high likelihood that Instagram users would be subject to sex trafficking, and the gravity of harm caused by sex

trafficking is extremely high in terms of the long-lasting or permanent physical and emotional toll on trafficking victims.  And the burden on Facebook to adopt precautions in Instagram's design that would have been effective against sex trafficking on Instagram was minor in comparison.

188.    The burden on Facebook to implement age and identity verification and reporting tools was minimal, as such tools are widely deployed by other online retailers and social media companies, and any such burden was far outweighed by the magnitude and likelihood of harm to an unsuspecting victim of being groomed, recruited, or sold into sex trafficking.  Facebook breached its duty of care in failing to use reasonable care to adopt these cost-effective, reasonably available alternative designs, including identity verification through photo identification, mechanisms to prevent the same person from making multiple fake accounts with fake identities, and enhanced reporting tools for trafficking such as a reporting tool that immediately connected the user to live Facebook employees, a reporting tool accessible to persons without an Instagram account, or a reporting tool with a "panic button" that directly and immediately alerts authorities of trafficking.  Alternative designs would have reduced the risk and danger of sex trafficking on the Instagram platform but would still have allowed Instagram to serve effectively the same purpose as a social media platform, like the defectively designed Instagram product.

189.    A reasonable company under the same or similar circumstances to Facebook would have designed a safer product than the Instagram product Facebook released.

190.    Jane Doe's injuries were the proximate result of the defects in Facebook's Instagram product discussed above, among others.  Jane Doe's severe injuries as a victim of sex trafficking were the foreseeable result of Facebook's defective design of its Instagram product—

which allowed sex traffickers to use Instagram without properly verifying their identity, which allowed sex traffickers to operate under fake accounts with false identities that facilitated their efforts to entrap vulnerable victims, and which prevented effective reporting of sex trafficking on its Instagram product.

191.    Jane Doe's injuries were directly and proximately caused by Facebook's negligence in defectively designing its social media products through its failure to include adequate identify verification and adequate mechanisms to prevent the creation of fake accounts. Facebook's negligence in defectively designing its Instagram product was a substantial factor in causing Jane Doe's injuries.  If Facebook's Instagram product had not been defectively designed with inadequate identity verification procedures and inadequate mechanisms to prevent fake accounts, R.L. would not have been able to make a fake account through which he trafficked Jane Doe.  Jane Doe would not have been subject to trafficking and injury if R.L. had been required to verify his true identity to create an account rather than being permitted to operate in disguise through a fake account.

192.    Jane Doe's injuries were also proximately caused by Facebook's negligence in defectively designing its social media products through its failure to include adequate mechanisms to report human trafficking.  If Facebook's Instagram product had not been defectively designed and had included adequate procedures to report sex trafficking on Facebook's Instagram product, R.L.'s trafficking scheme would have been reported to Facebook, and Facebook could have reported R.L.'s trafficking enterprise to law enforcement and enabled law enforcement to take action against R.L. before he had the opportunity to entrap Jane Doe and subject her to sex trafficking.

193.    As a result of Facebook's negligence, Jane Doe was trafficked and has suffered serious damages in the form of physical injury, emotional distress, medical expenses, and loss of income and earning capacity from her use of Facebook's Instagram product.

194.    As a result of the injuries Facebook caused to Jane Doe, Jane will continue to require additional healthcare, medical, incidental, and other related expenses in the future.

195.    Facebook's conduct and the conduct of its officers, directors, and managing agents was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displays a want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health and safety of its consumers, and warrants an award of punitive damages sufficient to punish Facebook and deter other companies from similar conduct.   Although Facebook and its officers, directors, and managing agents knew that its Instagram product was defective and dangerous in the ways described herein (among others), and knew that because of those defects Instagram could not be used safely for its intended purpose as a social media application, Facebook nonetheless placed Instagram on the market willfully and in conscious disregard of the danger to the safety of the public posed by the product.

196.    Thus, Facebook is further liable to Jane Doe for punitive damages based upon its willful, wanton, malicious, oppressive, and fraudulent conduct toward users, including Jane Doe, whom it knew would be seriously harmed through the use of Facebook's Instagram product.

## COUNT 5: NEGLIGENCE—FAILURE TO WARN

197.    Jane Doe realleges and incorporates by reference each and every preceding and succeeding paragraph as though set forth fully at length herein.

198.    Instagram is a social media product, Facebook has repeatedly acknowledged that Instagram is a product, and Facebook identifies Instagram as a product in its 10-K filings with the SEC.[15]

199.    Facebook is the designer, manufacturer, developer, manager, operator, distributor, formulator, constructor, and producer of the Instagram product, and Facebook marketed and put the Instagram product into the stream of commerce and benefitted from its Instagram product being used by Jane Doe, a foreseeable user of the Instagram product.

200.    Facebook's Instagram product is distributed and sold to the public through retail channels such as the Apple App Store and Google Play Store.

201.    Facebook markets and advertises its Instagram product to the public for personal use of end-users/consumers like Jane Doe.

202.    At all relevant times, Facebook knew, or should have known by the exercise of reasonable care, about the danger of human trafficking created by its Instagram product when the product was used in a reasonably foreseeable manner.  The risk of human trafficking was known and knowable in light of Facebook's own internal data, studies, and knowledge regarding its Instagram product at all relevant times.   And the risk of sex trafficking through the Instagram product was known and knowable to Facebook in light of generally prevailing scientific, medical, and technical knowledge, that was available at the time of the manufacture and distribution of Facebook's Instagram product.

203.    Facebook knew, or by the exercise of reasonable care should have known, that consumers such as Jane Doe would not have realized the risk of human trafficking posed by the Instagram product.  Further, the risk of human trafficking was not immediately apparent to Jane

---

[15] *See, e.g.*, Meta Platforms, Inc., Annual Report (Form 10-K) (Feb. 2, 2024), *available at* https://investor.fb.com/financials/default.aspx.

-49-

Doe or other users of the Instagram product and could not be independently verified by Jane Doe through her own inspection of the product.  The risk of trafficking on Instagram was not known by Jane Doe or obvious to her.

204.   At all relevant times, under California law, Facebook had a duty to exercise reasonable care and caution for the safety of all reasonably foreseeable users of its products, such as Jane Doe, including a duty to warn users of hazards that Facebook knew to be present, but not obvious, to users.

205.   Facebook had a duty to warn Jane Doe about the dangers of sex trafficking on its Instagram product, which Facebook was fully aware of.

206.   Facebook was negligent, grossly negligent, reckless, and/or careless in that it failed to exercise ordinary care and caution for the safety of users, like Jane Doe, using Facebook's Instagram product.

207.   Facebook was negligent and breached its duty of care in failing to provide adequate warnings to Jane Doe that sex trafficking was rampant on Facebook's platforms, or that foreseeable product use included interactions with traffickers who could seek to groom, recruit, and sell an unsuspecting user like Jane Doe into sex trafficking.

208.   Facebook did not warn Jane Doe about the dangers of sex trafficking or otherwise implement awareness campaigns to inform the users of its Instagram product about the dangers of trafficking on Instagram.

209.   Furthermore, a reasonably prudent company in Facebook's position would have known about the magnitude and likelihood of harm posed to unsuspecting victims by the presence of traffickers on its social media products, and would have provided adequate warnings

of these harms to its users. Facebook's negligent failure to provide such warnings fell well below the standard of care.

210.    Facebook could have satisfied its duty by providing the customers who use its products, like Jane Doe, with warnings about the dangers of sex trafficking on the Instagram product and the warning signs/indicia of sex trafficking through various means, including by posting warnings to users' feeds, using advertising space for public service announcements regarding the dangers and signs of trafficking, or requiring users to read warnings about the danger of trafficking in order to make an account.  But Facebook did not take these simple, cost-effective steps, and its failure to do so breached its duty of ordinary care to its customers, including Jane Doe.

211.    Jane Doe's severe injuries as a victim of sex trafficking were the foreseeable result of Facebook's failure to provide adequate warnings of the danger of sex trafficking on its Instagram product to make Jane Doe and other users aware of the risks and signs of sex trafficking.

212.    Jane Doe's injuries were directly and proximately caused by Facebook's negligence and breach of duty in failing to provide adequate warnings of the dangers of human trafficking on its Instagram platform, which Facebook had long known about.  Facebook's negligence in failing to provide adequate warnings was a substantial factor in causing Jane Doe's injuries.  If Facebook had provided adequate warnings regarding the dangers of sex trafficking on its Instagram product, Jane Doe would have been on alert to avoid trafficking on Instagram. If Facebook had provided adequate warnings of the dangers of trafficking on its platforms, Jane Doe would have heeded those warnings, would have been able to recognize the established signs of trafficking on Instagram, and would have avoided being trafficked through Instagram.  But

because Jane Doe was not provided with warnings regarding human trafficking on Instagram, she was unaware of the dangers of trafficking and was unable to recognize the signs of human trafficking and could not take the steps she otherwise would have taken to avoid trafficking on Instagram.   As a result, Jane Doe became entrapped in R.L.'s trafficking scheme.

213.   As a result of Facebook's negligent failure to warn, Jane Doe was trafficked and has suffered serious damages in the form of physical injury, emotional distress, medical expenses, and loss of income and earning capacity from her use of Facebook's Instagram product.

214.   As a result of the injuries Facebook caused to Jane Doe, Jane will continue to require additional healthcare, medical, incidental, and other related expenses in the future.

215.   Facebook's conduct and the conduct of its officers, directors, and managing agents in failing to warn of the danger of sex trafficking posed by its Instagram product—despite its knowledge of the risk—was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displays a want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health and safety of its consumers, and warrants an award of punitive damages sufficient to punish Facebook and deter other companies from similar conduct.

216.   Thus, Facebook is further liable to Jane Doe for punitive damages based upon its willful, wanton, malicious, oppressive, and fraudulent conduct toward users, including Jane Doe, whom it knew would likely be seriously harmed through the use of Facebook's Instagram product.

### VIII.   DAMAGES

217.   Jane Doe adopts and re-alleges each paragraph above as if set forth herein.

218.   Facebook's acts and omissions caused Jane Doe to sustain legal damages.

219.   Jane Doe is entitled to be compensated for personal injuries and economic damages caused by Facebook, including:

   a.   Actual damages (both past and future), including but not limited to physical pain and suffering, expenses for medical treatment, and other economic harm that includes but is not limited to lost earnings and loss of earning capacity

   b.   Mental anguish, loss of enjoyment of life, and emotional distress damages (until trial and in the future)

   c.   General and special damages

   d.   Direct damages

   e.   Incidental and consequential damages

   f.   Restitution

   g.   Unjust enrichment

   h.   Disgorgement of profits

220.   Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

221.   A constructive trust should be imposed on Facebook and the Court should sequester any benefit or money wrongfully received by Facebook for the benefit of Plaintiff.

## IX.   PUNITIVE DAMAGES

222.   Jane Doe is entitled to exemplary, treble, and punitive damages against Facebook as a result of its outrageous, wanton, willful, oppressive, fraudulent, reprehensible, and malicious conduct underlying Jane Doe's claims.  *See, e.g.*, *Alfaro v. Gandy*, 2019 WL 1789587, at *1 (S.D. Tex. Apr. 24, 2019); Cal. Civ. Code § 3294.

## X.   ATTORNEYS' FEES AND COSTS

223.   Plaintiff is entitled to recover its costs, expert fees, and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. *E.g.*, 18 U.S.C. § 1595(a).

-53-

224.   All conditions precedent to Plaintiff's recovery of its costs and attorneys' fees have occurred, or will occur prior to entry of judgment in this suit.

## XI.   **PRAYER**

For these reasons, Jane Doe prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Jane Doe and against Facebook for:

a.   All economic damages to which she is entitled;

b.   All actual damages to which she is entitled;

c.   All incidental and consequential damages to which she is entitled;

d.   All mental anguish and emotional distress damages to which she is entitled;

e.   All disgorgement of profits to which she is entitled;

f.   All unjust enrichment damages to which she is entitled;

g.   Exemplary, treble, and/or punitive damages;

h.   Attorneys' fees and costs of suit;

i.   Pre-judgment and post-judgment interest at the highest rate allowed by law; and

j.   All other relief to which she is entitled in law or in equity.

Dated:  April 19, 2024                              Respectfully submitted,

  /s/   *Amanda J.G. Walbrun*
Amanda J. G. Walbrun
CA State Bar No. 317408
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California  91367
Telephone:  (818) 340-5400
walbrun@boucher.la

Annie McAdams, *pro hac vice*
ANNIE MCADAMS PC
2900 North Loop West, Suite 1130
Houston, Texas  77092
Telephone:  (713) 785-6262

-54-

annie@mcadamspc.com

David E. Harris, *pro hac vice*
SICO HOELSCHER HARRIS, LLP
819 N. Upper Broadway
Corpus Christi, Texas  78401
Telephone:  (361) 653-3300
dharris@shhlaw.com

Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

PLAINTIFF Jane Doe hereby demands a trial by jury as to all claims and issues in this action that are so triable.

Dated:  April 19, 2024                              Respectfully submitted,

                                                   /s/   *Amanda J.G. Walbrun*

                                                   Amanda J. G. Walbrun
                                                   CA State Bar No. 317408
                                                   BOUCHER LLP
                                                   21600 Oxnard Street, Suite 600
                                                   Woodland Hills, California  91367
                                                   Telephone:  (818) 340-5400
                                                   walbrun@boucher.la

                                                   Annie McAdams, *pro hac vice*
                                                   ANNIE MCADAMS PC
                                                   2900 North Loop West, Suite 1130
                                                   Houston, Texas  77092
                                                   Telephone:  (713) 785-6262
                                                   annie@mcadamspc.com

                                                   David E. Harris, *pro hac vice*
                                                   SICO HOELSCHER HARRIS, LLP
                                                   819 N. Upper Broadway
                                                   Corpus Christi, Texas  78401
                                                   Telephone:  (361) 653-3300
                                                   dharris@shhlaw.com

                                                   Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of April, 2024, a copy of the above document was served on all counsel of record via the Court's CM/ECF system.

/s/    *Amanda J.G. Walbrun*
Amanda J. G. Walbrun
