Amanda J. G. Walbrun
CA State Bar No. 317408
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367
Telephone: (818) 340-5400
walbrun@boucher.la

Annie McAdams (*Pro Hac Vice*)
ANNIE MCADAMS PC
2900 North Loop West, Suite 1130
Houston, Texas 77092
Telephone: (713) 785-6262
annie@mcadamspc.com

David E. Harris (*Pro Hac Vice*)
SICO HOELSCHER HARRIS, LLP
819 N. Upper Broadway
Corpus Christi, Texas 78401
Telephone: (361) 653-3300
dharris@shhlaw.com

Warren W. Harris
BRACEWELL LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 221-1490
warren.harris@bracewell.com

*Attorneys for Jane Doe (K.B.), Plaintiff*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE (K.B.),<br><br>          Plaintiff,<br><br>     v.<br><br>BACKPAGE.COM, LLC, et al.,<br><br>          Defendants. | Case No. 3:23-cv-02387-RFL<br><br>**PLAINTIFF K.B.'S OPPOSITION TO DEFENDANT META PLATFORMS, INC.'S RULE 12(B)(6) MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>*The Hon. Rita F. Lin*<br><br>Hearing Date: November 5, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Rita F. Lin<br>Place: Courtroom 15, 18th Floor<br><br>Trial Date: Not Set |

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ iii

STATEMENT OF THE ISSUES ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 1

LEGAL STANDARD ........................................................................................................... 3

ARGUMENT ......................................................................................................................... 3

I.   Doe's Claims Are Not Barred By Section 230. ......................................................... 3

    A.   Doe's Section 1595 claim is not barred by Section 230. ................................... 4

    B.   Doe's products-liability claims are not barred by Section 230. ........................ 5

        1.   Doe's design-defect claims (counts 2 and 4) are not barred by Section 230. ................................................................................................ 6

            a.   Lack of adequate identity verification procedures and mechanisms to prevent fake accounts ........................................... 6

            b.   Lack of adequate mechanisms to report human trafficking. .................... 8

        2.   Doe's failure-to-warn claims (counts 3 and 5) are not barred by Section 230. ................................................................................................ 9

II.  Doe's Claims Are Adequately Pleaded. .................................................................... 11

    A.   Doe adequately pleaded that Meta violated Section 1595. ............................. 11

        1.   Meta participated in a venture engaged in sex-trafficking. ................. 11

        2.   Meta knowingly benefitted from its participation in the venture. ..... 14

    B.   Doe's products-liability and negligence claims are adequately pleaded. ....... 15

        1.   Doe has plausibly alleged causation. .................................................... 15

            a.   Cause in fact. .................................................................................. 15

            b.   Legal causation. ............................................................................. 18

        2.   Instagram is a product subject to products-liability claims. .............. 19

Plaintiff's Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss Third Amended Complaint
Case No. 23-CV-02387-RFL

1

*Page*

2          3.      Meta owes Doe a legal duty that supports her negligence claims. ..................... 22

3               a.      Doe's complaint does not rest on an affirmative duty to protect. .................................................................................. 22

4               b.      The *Rowland* factors do not support creating an exception to the duties of care ..................................................... 24

6 CONCLUSION...................................................................................................... 25

7 CERTIFICATE OF SERVICE............................................................................... 27

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss Third Amended Complaint
Case No. 23-CV-02387-RFL

## <u>TABLE OF AUTHORITIES</u>

***Page(s)***

*Cases*

*A.M. v. Omegle.com, LLC*,
   614 F. Supp. 3d 814 (D. Or. 2022) ................................................................. 8, 10

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021) ................................................................................ 3

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 3

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ................................................................................ 3

*Brookes v. Lyft Inc.*,
   2022 WL 19799628 (Fla. Cir. Ct. Sep. 30, 2022) ............................................... 22

*Brown v. USA Taekwondo*,
   483 P.3d 159 (Cal. 2021) ................................................................................. 23-24

*Chanda v. Fed. Home Loans Corp.*,
   155 Cal. Rptr. 3d 693 (Cal. Ct. App. 2013) ........................................................ 18

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) .................................................................... 3, 8, 10-11

*Doe v. Uber Techs., Inc.*,
   90 F.4th 946 (9th Cir. 2024) ................................................................................ 24

*Does 1-6 v. Reddit, Inc.*,
   51 F.4th 1137 (9th Cir. 2022) ..................................................................... 5, 12, 14

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019) ................................................................................ 4

*Est. of B.H. v. Netflix, Inc.*,
   2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ....................................................... 21

*In re Facebook, Inc.*,
   625 S.W.3d 80 (Tex. 2021) ...................................................................... 13, 21, 24

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc) ............................................................... 3

**Page(s)**

*G.G. v. Salesforce.com, Inc.*,
   76 F.4th 544 (7th Cir. 2023) ........................................................................... 12-14

*Geiss v. Weinstein Co. Holdings LLC*,
   383 F. Supp. 3d 156 (S.D.N.Y. 2019) ............................................................ 12, 14

*Hacala v. Bird Rides, Inc.*,
   306 Cal. Rptr. 3d 900 (Cal. Ct. App. 2023) ......................................................... 24

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) ....................................................................... 3-5, 7

*Jackson v. Airbnb, Inc.*,
   639 F. Supp. 3d 994 (C.D. Cal. 2022) ................................................................ 21

*Jacobs v. Meta Platforms, Inc.*,
   2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023) ................................................. 21

*Jane Doe No. 1 v. Uber Techs., Inc.*,
   294 Cal. Rptr. 3d 664 (Cal. Ct. App. 2022) ......................................................... 21

*Kuciemba v. Victory Woodworks, Inc.*,
   531 P.3d 924 (Cal. 2023) .............................................................................. 24

*Lama v. Meta Platforms, Inc.*,
   2024 WL 2021896 (N.D.N.Y. May 6, 2024) ........................................................... 4

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ..................................................................... 4, 7-9

*Noble v. Weinstein*,
   335 F. Supp. 3d 504 (S.D.N.Y. 2018) ................................................................ 12

*Putensen v. Clay Adams, Inc.*,
   12 Cal. App. 3d 1062 (Cal. Ct. App. 1970) .......................................................... 23

*Rowland v. Christian*,
   443 P.2d 561 (Cal. 1968) .......................................................................... 24-25

*In re Social Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*,
   2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) .................................................. *passim*

*Social Media Cases*,
   2023 WL 6847378 (Cal. Super. Ct. Oct. 13, 2023) .................................................. 21

Plaintiff's Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss Third Amended Complaint
Case No. 23-CV-02387-RFL

**Page(s)**

*Soule v. Gen. Motors Corp.*,
  882 P.2d 298 (Cal. 1994) ............................................................................... 18

*State Dep't of State Hosps. v. Superior Ct.*,
  349 P.3d 1013 (Cal. 2015) ...................................................................... 15, 18

*Steinle v. United States*,
  17 F.4th 819 (9th Cir. 2021) ........................................................................ 18

*United States v. Afyare*,
  632 F. App'x 272 (6th Cir. 2016) ................................................................ 12

*Ziencik v. Snap, Inc.*,
  2023 WL 2638314 (C.D. Cal. Feb. 3, 2023) .............................................. 21

**Statutes**

18 U.S.C. § 1591 ........................................................................... 5, 12, 14

18 U.S.C. § 1595 ....................................................................2, 4-5, 11-12, 14

47 U.S.C. § 230(c)(1) ....................................................................................... 3

47 U.S.C. § 230(e)(5)(A) ................................................................................. 5

Cal. Civ. Code § 1714 ................................................................................... 23

**Other Authorities**

Restatement (Third) of Torts: Prod. Liab. § 1 (1998) ................................. 23

Restatement (Third) of Torts: Prod. Liab. § 19(a) (1998) .......................... 19

Plaintiff Jane Doe (K.B.) ("Doe"), files this opposition to the Motion to Dismiss filed by Defendant Meta Platforms, Inc. (f/k/a Facebook, Inc.) ("Meta").  For the reasons stated herein, Meta's motion should be denied.

## STATEMENT OF THE ISSUES

1.  Whether Doe's claims are barred by Section 230(c)(1) of the Communications Decency Act.

2.  Whether Doe's claims are adequately pleaded.

## STATEMENT OF FACTS

Social media products play a pivotal role in the operation and expansion of the modern-day human trafficking industry.  Dkt. 102 ¶¶ 27-28, 37.  Meta is the designer and distributor of Instagram, a social media product through which users post photographs and connect with other users.  *Id.* ¶¶ 29, 118-19.  Instagram is a rampant breeding ground for sex trafficking where victims are regularly groomed and sold for sex online.  *Id.* ¶¶ 1, 7, 14, 36, 109-10, 162.  Meta actively proliferates human trafficking on Instagram, including by employing algorithms that connect sex traffickers and their victims.  *Id.* ¶¶ 3-4, 6-7, 11-13, 63-67, 109-11.  The prevalence of human trafficking on Instagram is well documented, and Meta has long been aware of it.  *Id.* ¶¶ 2, 5, 8-10, 12, 36, 40, 46, 53, 59, 77, 92, 111, 158, 202.

But Meta has not adopted readily available alternative designs for Instagram to curb human trafficking.  Specifically, Meta has not implemented identity verification procedures or other mechanisms to prevent traffickers from operating under fake accounts with fake identities.  *Id.* ¶¶ 12, 15, 28, 41, 45-52, 91, 94, 96, 130-32, 136, 140, 143, 183-84.  Likewise, Meta has not implemented adequate mechanisms for users to report human trafficking on Instagram.  *Id.* ¶¶ 12, 15, 42-43, 95, 133, 140.  And although Meta knows of the problem, Meta has failed to provide adequate warnings to its users about the dangers of sex trafficking on Instagram.  *Id.* ¶¶ 12, 15, 53-56, 97, 158-67, 207, 210.

In short, Meta facilitates sex trafficking on Instagram through its own affirmative acts and its choices in the design and operation of Instagram.  Meta's conduct is traceable to its boundless efforts to

maximize its profits. *Id.* ¶¶ 2-4, 6-7, 11-13, 15, 57-58, 66-67, 79, 92, 109-10, 115. Meta connects sex traffickers with victims because Meta profits from the increased user engagement and advertising revenue. *Id.* ¶¶ 3-8, 63-67, 109-11. Similarly, Meta has declined to adopt alternative designs for Instagram, and failed to implement adequate warnings, because designs and warnings that would inhibit human trafficking would also decease Meta's profits. *Id.* ¶¶ 12-13, 15, 48-58, 79, 92, 109-10.

Plaintiff Jane Doe was an Instagram user in 2017. *Id.* ¶¶ 19, 68-69, 121. Doe was trafficked and sold for sex through Instagram as a result of Meta's design and operation of Instagram. *Id.* ¶¶ 14, 39, 73-85, 88-89, 101, 143-49, 167, 190-91. Instagram's algorithms connected Doe with R.L., an adult sex trafficker with whom Doe had no prior relationship. *Id.* ¶¶ 4, 63, 65, 69, 109. Because Meta did not employ identity verification procedures, R.L. conducted sex trafficking through Instagram under a fake account. *Id.* ¶¶ 14, 28, 41, 50, 70, 93-94, 143, 145, 191. Thus, Doe did not have accurate information about R.L.'s identity to evaluate him. *Id.* ¶¶ 14, 28, 50, 93-94, 143, 145, 191. And because Meta did not provide adequate warnings about human trafficking on Instagram, Doe was unaware of the danger and was unable to recognize the threat posed by R.L. *Id.* ¶¶ 15, 97-100, 102, 167, 208-10, 212. Further, Instagram lacked adequate procedures to enable users to report traffickers like R.L. *Id.* ¶¶ 101, 146, 192.

R.L. groomed Doe for trafficking through Instagram. *Id.* ¶¶ 14-15, 28, 71-73. By the summer of 2017, R.L. began making public posts that openly advertised Doe for sale for sex. *Id.* ¶¶ 14-15, 74-76, 78, 83-84, 112. Doe was trafficked on Instagram and repeatedly sold for commercial sex acts. *Id.* ¶¶ 14, 80-83. R.L. was later convicted of sex-trafficking crimes. *Id.* ¶ 86.

Doe sued Meta under 18 U.S.C. § 1595 based on Meta's actions in knowingly benefitting from participating in a venture engaged in sex trafficking. Dkt. 13. The court granted Meta's motion for judgment on the pleadings and granted leave to amend. Dkt. 96. Doe filed an amended complaint, pleading additional claims under strict products-liability and negligence theories. Dkt. 102.

-2-

**LEGAL STANDARD**

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face" such that the facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). While the plaintiff's claim to relief must be plausible, it need not be probable. *Id.* In ruling on a motion to dismiss, the court accepts all factual allegations as true and construes the pleadings in the light most favorable to the nonmoving party. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1114 (9th Cir. 2021).

**ARGUMENT**

**I.    Doe's Claims Are Not Barred By Section 230.**

Meta contends that Doe's claims are barred by Section 230(c)(1) of the Communications Decency Act, Dkt. 105 at 5-11, but Doe's claims do not fall within that provision. Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Under Section 230(c)(1), a claim treats a defendant as a "publisher" where it faults the defendant for decisions "involv[ing] reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

Although this "publisher" protection sometimes provides a defense, Section 230 does not "provide[] an all purpose get-out-of-jail-free card for businesses that publish user content on the internet." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016); *see also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc) ("The Communications Decency Act was not meant to create a lawless no-man's-land on the Internet."). And Section 230 does not "declare[] a general immunity from liability deriving from third-party content." *Barnes*, 570 F.3d at 1100; *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir.

2019).  Nor does Section 230 apply merely because third-party content is a "but for" cause of a plaintiff's injury.  *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092-93 (9th Cir. 2021); *HomeAway.com*, 918 F.3d at 682.[1]  Rather, Section 230 requires a more nuanced analysis of "what the duty at issue actually requires"—*i.e.*, whether the plaintiff's claim imposes a legal duty that "necessarily require[s]" the defendant to monitor third-party content or engage in other publication activities.  *HomeAway.com*, 918 F.3d at 682.  Doe's claims are not barred by Section 230 because they do not impose duties that would require Meta to engage in any publication activities or fault Meta for engaging in "publisher" conduct.

### A.  *Doe's Section 1595 claim is not barred by Section 230.*

As Doe has argued, Meta's conduct in knowingly benefitting from facilitating sex trafficking on Instagram under 18 U.S.C. § 1595(a) does not fault Meta for acting as a "publisher" under any reading of that term.  *See* Dkt. 87 at 4-11.  The Court, however, previously held that Section 230 bars Doe's Section 1595 claim.  Dkt. 96.  Doe disagrees that holding Meta responsible for creating a breeding ground for human trafficking would hold Meta responsible for failing to *remove* content.  Rather, it would hold Meta responsible for affirmatively facilitating trafficking.  Further, Doe disagrees that faulting Meta for using an algorithm to connect sex traffickers and their victims would treat Meta as a "publisher."  Manufacturing relationships between strangers is not a function of a "publisher."  Although the Ninth Circuit has applied Section 230 to algorithms, the crux of the plaintiff's argument and the court's analysis addressed whether the algorithm's recommendation was the defendant's own content—as opposed to *third-party* content implicating Section 230.  *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096-99 (9th Cir. 2019).  But that is a separate question from whether the plaintiff's claims treat the

---

[1] These authorities refute the notion that Section 230 applies merely because "the alleged harm occurred *as a result of* content posted by third-party users on the app."  Dkt. 105 at 10 (quoting *Lama v. Meta Platforms, Inc.*, 2024 WL 2021896, at *6 (N.D.N.Y. May 6, 2024)).

defendant as a "publisher." Even assuming Meta is not an "information content provider," employing algorithms to connect traffickers and victims is still not "publisher" conduct under Section 230.

Further, even where Section 230(c)(1) applies, Section 230 was amended to preserve sex-trafficking claims under 18 U.S.C. § 1595 from the scope of Section 230. *See* 47 U.S.C. § 230(e)(5)(A). Doe recognizes that the Ninth Circuit has interpreted Section 230(e)(5)(A) to require a showing that the defendant's conduct amounts to a criminal violation of 18 U.S.C. § 1591, and this Court is bound by that decision. *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1141-45 (9th Cir. 2022). However, Doe believes that *Reddit* was wrongly decided and that a plaintiff may plead a Section 1595 beneficiary liability claim under Section 230(e)(5)(A) where the defendant knowingly benefits from participating in a *venture* that violates Section 1591, even if the civil defendant itself did not violate Section 1591. Because Doe has pleaded that Meta violated Section 1595 by participating in a venture that violated Section 1591, Doe's Section 1595 claim is preserved under a proper reading of Section 230(e)(5)(A).

### B.    *Doe's products-liability claims are not barred by Section 230.*

Doe pleads strict liability and negligence claims based on the defective design of Meta's Instagram product and Meta's failure to warn of the known danger of sex trafficking on Instagram. Dkt. 102 ¶¶ 116-216. To determine whether Section 230 applies to these claims, the court must consider what Meta would be required to do to satisfy its duties to Doe. *See HomeAway.com*, 918 F.3d at 682. Because Meta could have satisfied its duties without changing third-party content on Instagram, conducting a detailed investigation, monitoring third-party content, or engaging in other "publisher" activities, Section 230 does not protect Meta. For purposes of Section 230, each defect in Instagram's product must be analyzed individually. *See In re Social Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 2023 WL 7524912, at *11-16 (N.D. Cal. Nov. 14, 2023).

1. **Doe's design-defect claims (counts 2 and 4) are not barred by Section 230.**

   a. **Lack of adequate identity verification procedures and mechanisms to prevent fake accounts.**

Doe alleges that Instagram is defective because it does not contain adequate identity verification procedures—or other mechanisms to prohibit fake accounts—and thereby allows sex traffickers to use fake accounts with fake identities to entrap victims and evade law enforcement. *See* Dkt. 102 ¶¶ 12, 15, 28, 41, 45-52, 91, 94, 96, 130-32, 136, 140, 143, 183-84. Meta could have required new users to provide identity verification, such as photo identification—a requirement Meta already had in place for political advertisers. *Id.* ¶¶ 48-49, 51, 140, 183, 188. Likewise, Meta could have adopted mechanisms to prevent a single person from operating under multiple fake accounts or to prevent a banned user from returning under another fake account. *Id.* ¶¶ 45, 47, 49, 51, 96, 130, 140, 183, 188. The duties these allegations impose—requiring Meta to implement identity verification and protect against fake accounts—would not require Meta to monitor third-party content on Instagram or otherwise perform "publisher" activities. These defects concern Instagram's account-creation process—a step that occurs before the third-party user can post content and therefore before any published third-party content exists. In *In re Social Media*, Judge Rogers addressed analogous allegations that social media products were defective due to a lack of adequate age verification procedures and concluded that such defect allegations were not barred by Section 230. *In re Social Media*, 2023 WL 7524912, at *11-12. The same result logically follows here.

Meta contends that Doe's claim regarding inadequate identity verification procedures is barred by Section 230 because it would require Meta to monitor and remove users' profiles. Dkt. 105 at 10. Similarly, Meta argues that preventing fake accounts would require Meta to compare users' profiles to their government identification and remove or alter those profiles that do not match. *Id.* at 10-11. But nothing in Doe's complaint would require Meta to monitor the existing third-party profiles on Instagram and remove or edit the fake accounts. Again, the defects concern Instagram's initial account-creation

-6-

process: Instagram should implement identity verification and other mechanisms to prevent fake accounts *before* a user can create a profile or post content (*i.e.*, before any "publishing" has occurred).

Notably, Meta's arguments would apply equally to *In re Social Media*—the social media companies *could have* audited their users' profiles and removed profiles with inaccurate age information. But the court nonetheless concluded that Section 230 was inapplicable to the age-verification defect. *In re Social Media*, 2023 WL 7524912, at *11-12.  That result is correct because Section 230 does not apply "any time a legal duty *might* lead a company to respond with monitoring or other publication activities"— it applies only where "the duty would *necessarily require* an internet company to monitor third-party content." *HomeAway.com*, 918 F.3d at 682 (emphasis added).  As just explained, Meta could have fixed these defects through altering its account-creation process, without monitoring or altering published third-party profiles.  Similarly, the fact that the account creation process is a precursor to a user ultimately posting a profile with third-party content does not trigger Section 230.  *See* Dkt. 105 at 10-11.  Again, the same thing could be said about the age-verification defect in *In re Social Media*.

The Ninth Circuit's opinion in *Lemmon* is also instructive.  There, Snap's social media product, Snapchat, allowed users to record their speed and superimpose their speed on top of a photo or video. 995 F.3d at 1088-89.  Snapchat users suspected that they would be rewarded for taking a photo or video with this "Speed Filter" and sharing it if their recorded speed was 100 mph or more.  *Id.* at 1088-90.  The decedents were killed in a car accident while documenting their speed on Snapchat.  *Id.* at 1087-88.

Although Snapchat's Speed Filter was designed to be superimposed onto a user's photos or videos (*i.e.*, third-party content) and published, the court nonetheless concluded that Section 230 did not bar a negligent-design claim brought by the decedents' parents.  *Id.* at 1087-89, 1091-94.  The court rejected the idea "that CDA immunity is appropriate because the Parents' claim depends on the ability of Snapchat's users to use Snapchat to communicate their speed to others."  *Id.* at 1092.  The court

-7-

explained: "That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the Parents seek to hold Snap liable for its role in violating its distinct duty to design a reasonably safe product." *Id.* The court acknowledged that "Snap 'acted as the publisher or speaker of user content by' transmitting [the decedent's] snap, 'and that action could be described as a but-for cause of [the decedents'] injuries.'" *Id.* (quoting *Internet Brands*, 824 F.3d at 853). But the court explained that, although "publishing content is 'a but-for cause of just about everything' Snap is involved in, that does not mean that the Parents' claim, specifically, seeks to hold Snap responsible in its capacity as a 'publisher or speaker.'" *Id.* at 1093. The court emphasized that "[t]he duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content." *Id.* The parents' lawsuit therefore "d[id] not seek to hold Snap liable for its conduct as a publisher or speaker. Their negligent design lawsuit treats Snap as a products manufacturer." *Id.* at 1092.

Thus, *Lemmon* did not apply Section 230, even though the Speed Filter was intertwined with the publication of third-party content such that correcting the defective design would have affected users' process for posting content. Likewise, Section 230 does not apply here simply because correcting Instagram's defects regarding identity verification and fake accounts would affect users' process for creating profiles containing third-party content. Doe alleges that Meta violated a duty to design a reasonably safe product that "'springs from' its distinct capacity as a product designer," not from its role as a publisher of third-party content. *See id.*; *see also A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 818-20 (D. Or. 2022) (design defect claims against online chat room were not barred by Section 230).

### b. Lack of adequate mechanisms to report human trafficking.

Instagram was also defective because it lacked adequate mechanisms to report human trafficking. Dkt. 102 ¶¶ 12, 15, 42-43, 95, 133, 140. Meta contends that these allegations are barred by Section 230 because they would impose liability on Meta for failing to remove offensive content. Dkt. 105 at 11.

-8-

But Meta could incorporate proper reporting mechanisms and respond to reports without removing content. Meta could have designed a reporting mechanism that required Meta to report traffickers to law enforcement, that connected the user with a Meta employee or law enforcement to render aid, that generated direct reports to law enforcement, or that at least permitted reports to be made without requiring the reporter to create an account and log in to Instagram. Dkt. 102 ¶¶ 42-43, 95-96, 133, 140, 146, 185, 188. None of these solutions would have required Meta to remove third-party content.

In *In re Social Media*, the court considered an analogous defect regarding inadequate mechanisms to report child sex abuse material, and the court rejected an argument identical to Meta's argument here. 2023 WL 7524912, at *11-13. The social media companies argued that "making reporting more accessible would necessarily require them to remove [the content]," but the court disagreed and determined that Section 230 was inapplicable. *Id.* at *13. The court explained that "[r]eceiving more reports does not require them to remove the content. They could respond by taking other steps, such as reporting the content to a government agency or providing relevant warnings." *Id.* Likewise, Meta could incorporate adequate mechanisms to report human trafficking without removing third-party content, and therefore Section 230 is inapplicable. Again, this design-defect claim stems from Meta's duties as a product designer, not a publisher. *Lemmon*, 995 F.3d at 1092.

### 2.    Doe's failure-to-warn claims (counts 3 and 5) are not barred by Section 230.

Doe's failure-to-warn claims allege that Meta knew of a widespread human-trafficking problem on its Instagram product, but it failed to provide adequate warnings about that danger. Dkt. 102 ¶¶ 12, 15, 53-56, 97, 158-67, 207, 210. Meta argues that Section 230 bars these claims because they would require Meta to monitor, remove, or disallow third-party content. Dkt. 105 at 9-10. Specifically, Meta points to Doe's allegations that her trafficker, R.L., posted content that contained obvious signs of human trafficking. *Id.* at 10. And Meta claims that it could not have warned Doe about R.L. *Id.*

Meta's focus on R.L. and the content he posted is misplaced. Doe's complaint does not claim that Meta should have monitored the content that R.L. posted and then specifically warned Doe that R.L. was a trafficker. Rather, Doe complains that Meta knew of a wide-spread human trafficking problem across its Instagram product, and Meta should have provided general warnings about the dangers of human trafficking on Instagram. Dkt. 102 ¶¶ 10, 12, 15, 53-56, 58, 97, 102, 158-67, 207, 210.

Importantly, courts have recognized that failure-to-warn claims can fall outside the scope of Section 230, particularly where the defendant learned of a danger by means other than monitoring third-party content. As Meta concedes, the Ninth Circuit held that a failure-to-warn claim was not barred by Section 230 where the defendant website learned about the danger at issue from an external source. Dkt. 105 at 10 (citing *Internet Brands*, 824 F.3d at 851, 853). The court explained that Section 230 did not apply to the failure-to-warn claim because "[a]ny alleged obligation to warn could have been satisfied without changes to the content posted by the website's users and without conducting a detailed investigation." *Internet Brands*, 824 F.3d at 851. The court noted that the defendant could have provided a warning by posting a notice on the website or by emailing its users, and the court held that an "alleged tort based on a duty that would require such a self-produced warning falls outside of section 230(c)(1)." *Id.* Likewise, the court in *In re Social Media* held that the plaintiffs' failure-to-warn claims were not barred by Section 230:

> The duty arises not from their publication of conduct, but from their knowledge, based on public studies or internal research, of the ways that their products harm children. Plaintiffs allege through these claims that defendants could meet this duty without making any changes to how they publish content, by providing warnings for any and all of the alleged defects.

2023 WL 7524912, at *16; *see also A.M.*, 614 F. Supp. 3d at 819-20 (rejecting application of Section 230 to claim that website failed to warn that child predators used the website).

-10-

Doe's failure-to-warn claims fit comfortably within these authorities because Doe alleges that Meta learned about the danger of sex trafficking on Instagram through external sources. *See* Dkt. 102 ¶ 158 (Meta knew that Instagram "posed a risk of harm from sex trafficking based on external information and its own studies and knowledge of its products," including documentation from "the press, law enforcement, scientific literature, and state and federal legislatures"); *see also id.* ¶ 10 (noting that "[n]umerous organizations and news outlets have reported on the rampant problem of sex trafficking on Instagram"). Further, Meta could have satisfied its duty to warn without changing the content posted to Instagram and without conducting a detailed investigation. Indeed, Meta could have fulfilled its duty by creating the exact type of "self-produced warning[s]" that the Ninth Circuit held "fall[] outside of section 230(c)(1)." *Internet Brands*, 824 F.3d at 851; *see, e.g.*, Dkt. 102 ¶¶ 55, 164 (Meta could have warned Instagram users "during the product registration process through warning labels, banners, or conspicuous messaging," "posting warnings to users' feeds," using advertising space for public service announcements, or requiring users to read warnings to make an account).

## II.    Doe's Claims Are Adequately Pleaded.

### A.    *Doe adequately pleaded that Meta violated Section 1595.*

Meta notes that "[t]o plead a section 1595 claim, a plaintiff must plausibly allege that the defendant (1) 'knowingly benefit[ed], financially or by receiving anything of value,' (2) 'from participation in a venture,' which (3) 'that person knew or should have known ha[d] engaged in an act in violation of' section 1591(a)." Dkt. 105 at 12 (quoting 18 U.S.C. § 1595(a)). Meta challenges only the first two elements. *See id.* at 1-2, 12.

#### 1.    Meta participated in a venture engaged in sex-trafficking.

Meta challenges whether Doe adequately alleges participation in a venture, but its arguments invoke the incorrect legal standard and otherwise ignore Doe's allegations. Dkt. 105 at 12-14. Meta

argues that Doe fails to allege that Meta participated in a "trafficking venture" with R.L., and Section 1595 requires "'participation in a *sex-trafficking venture*, not participation in other activities engaged in by the sex traffickers that do not further the sex-trafficking aspect of their venture.'"  *Id.* at 12 (quoting *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019)).  This argument fails because Section 1595 does not require participation in a "sex-trafficking venture."  Meta's cases erroneously pulled the "sex-trafficking venture" language from authority applying the *criminal* standard in Section 1591, not the civil standard in Section 1595.  *See Geiss*, 383 F. Supp. 3d at 169 (citing *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016)); *see also Noble v. Weinstein*, 335 F. Supp. 3d 504, 523-24 (S.D.N.Y. 2018) (citing *Afyare* for the "sex trafficking venture" standard).

Courts have widely rejected the applicability of the "sex-trafficking venture" standard to Section 1595.  As the Seventh Circuit explained, "[t]he text of Section 1595 does not say 'sex-trafficking venture,' but only 'venture.'  In other words, 'venture' is not described in criminal terms."  *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553-54 (7th Cir. 2023) (citation omitted).  Thus, "the relevant 'venture' under Section 1595 need not be 'specifically a sex trafficking venture.'"  *Id.* at 554.  Rather, "it can also be a business whose primary focus is not on sex trafficking."  *Id.* The court emphasized that "[n]early every court agrees," and it identified *Geiss* as an outlier.  *Id.* at 554 & n.8.

Meta states that the Ninth Circuit in *Reddit* "cited both *Geiss* and *Noble* with approval and quoted them on this point.  Both cases evaluated beneficiary liability under section 1595."  Dkt. 105 at 13 n.4. This argument suggests that *Reddit* approved of the standard in *Geiss* and *Noble* for Section 1595 claims. It did not.  The *Reddit* court cited *Geiss* and *Noble* to determine whether Reddit violated the criminal provision in Section 1591—*not* for the standard under Section 1595.  *See* 51 F.4th at 1145-46.  This Court should follow the weight of authority rejecting the "sex trafficking venture" requirement.  In any

Plaintiff's Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss Third Amended Complaint
Case No. 23-CV-02387-RFL

event, Meta's conduct and design choices did "further the sex-trafficking aspect" of the venture because they facilitated traffickers' ability to entrap and sell their victims. *See infra* at 13, 16-17.

Meta engaged in "culpable assistance to a wrongdoer" that constitutes participation in a venture. *G.G.*, 76 F.4th at 559. Contrary to Meta's arguments, the allegations here extend beyond but-for causation, "enabling" trafficking, or "making it easier" for bad actors to connect. Dkt. 105 at 13-14. Meta provided a mission-critical component to traffickers' operations by creating a breeding ground and marketplace for trafficking. Dkt. 102 ¶¶ 1, 7, 14, 36, 109-10. Moreover, Meta facilitated trafficking by employing algorithms to connect sex traffickers with victims. *Id.* ¶¶ 3-4, 6-7, 63-67, 109-11. Thus, this is not a case where Meta merely passively "enabled" trafficking. *See In re Facebook, Inc.*, 625 S.W.3d 80, 97-98 (Tex. 2021) (holding in a similar case under Texas law that Meta was not a passive intermediary, but engaged in "affirmative acts…to encourage unlawful conduct").

Moreover, in helping traffickers connect with and sell their victims, Meta engaged with traffickers in a "common undertaking or enterprise involving risk and potential profit." Dkt. 105 at 13. As explained in further detail below, *see infra* Part II.A.2, Meta financially benefits from connecting sex traffickers with their victims and otherwise facilitating trafficking on Instagram because doing so increases user engagement, data collection, and advertising revenue. *See* Dkt. 102 ¶¶ 1-3, 8-9, 11, 13, 66-67, 79, 109-10, 115. And traffickers like R.L. benefit from Meta's assistance in connecting with their victims and advertising them for sale. *See id.* ¶¶ 4, 7, 36, 40, 62-63, 74-76, 80, 109, 111. Thus, the relationship between sex traffickers like R.L. and Meta is a symbiotic one—a common undertaking geared towards maximizing their respective profits. It is therefore certainly not true that Meta "did not have any monetary relationship" with the traffickers. Dkt. 105 at 13. Nor does the relationship between Meta and R.L. resemble an "ordinary buyer-seller transaction." *Id.* at 13-14. R.L. did not buy goods from Meta and walk away. Rather, R.L.'s trafficking business was operated through the Instagram

-13-

product, and Instagram effectively delivered trafficking victims (the currency of R.L.'s business) to him. This easily constitutes "participation in a venture."

### 2. Meta knowingly benefitted from its participation in the venture.

Meta also contends that Doe has not pleaded that Meta knowingly benefitted from its participation in the venture. Dkt. 105 at 14-15. Meta argues that the knowing-benefit element of Section 1595 requires a showing that "the beneficiary defendant had 'actual knowledge and a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit.'" Dkt. 105 at 14 (quoting *Reddit*, 51 F.4th at 1145). As Meta recognizes, this standard comes from *Geiss*, which the *Reddit* court cited for the "knowing benefit" standard under the federal *criminal* provision in Section 1591, *not* the civil provision in Section 1595. *Id.* at 14 n.5.

Meta's arguments again depend on an erroneous standard from *Geiss*. As the Seventh Circuit explained, "a plaintiff can allege that the defendant 'knowingly benefitted' by alleging only that the defendant was aware that it was benefitting in some way from its participation in the venture…. [T]he benefit need not take the form of 'profits' that are 'the specific result' of a sex-trafficking venture." *G.G.*, 76 F.4th at 564. The court emphasized that "*Geiss* read 'knowingly benefits' to require a *quid pro quo* between trafficker and participant. But Section 1595 says nothing about why the sex-trafficker provides any benefit to the participant-defendant. In fact, the statute does not even require that the sex trafficker itself or himself provide any benefit." *Id.* at 565. Indeed, "*Geiss* is an outlier whose gloss on 'knowingly benefits' has been rejected by virtually every other court." *Id.* at 565 n.20 (collecting cases).

Under the proper standard, there is no question that Meta "was aware that it was benefitting in some way from its participation in the venture." *Id.* at 564. Meta measures its profits in terms of "connections" because connections increase user engagement, time spent on Instagram, data collection, and advertising revenue. Dkt. 102 ¶¶ 2-8, 67, 109. Thus, Meta knows that connecting traffickers and

-14-

victims increases its profits. *Id.* ¶¶ 3-8, 11, 67, 109. Further, Meta profits by selling advertisements on the Instagram pages that sell trafficking victims. *Id.* ¶¶ 66, 109-10. Internally, Meta has discussed the problem of sex-trafficking on Instagram and has explicitly acknowledged that it receives profits from sex trafficking. *Id.* ¶¶ 5, 9, 40, 46, 77, 92, 158, 202. Meta knowingly benefits from facilitating trafficking on Instagram because doing so maximizes user engagement, data collection, and advertising revenue. *Id.* ¶¶ 1-9, 11-13, 15, 57-58, 66-67, 79, 92, 109-10, 115. And it is no defense that Instagram is "free." Dkt. 105 at 15. This argument deliberately ignores Meta's business model. In exchange for providing "free" access to Instagram, Meta profits enormously through collecting data and selling advertisements. Dkt. 102 ¶¶ 3, 6, 11-13, 64, 66-67, 79, 109-10.

## B. *Doe's products-liability and negligence claims are adequately pleaded.*

Meta also challenges whether Doe's strict products-liability and negligence claims are adequately pleaded. Dkt. 105 at 15-25. Meta's arguments do not support dismissal.

### 1. Doe has plausibly alleged causation.

Meta argues that Doe has not adequately pleaded that Instagram's defects caused her injuries. Dkt. 105 at 15-19. The proximate cause inquiry involves (1) cause in fact, and (2) public policy considerations of legal cause. *State Dep't of State Hosps. v. Superior Ct.*, 349 P.3d 1013, 1021-22 (Cal. 2015). "Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint." *Id.* at 1022 (citation omitted). Meta's causation arguments can succeed only if "the facts are such that the only reasonable conclusion is an absence of causation." *Id.*

#### a. Cause in fact.

The complaint adequately alleges that Instagram's defects were a cause in fact of Doe's injuries. An act is a cause in fact if it is a "necessary antecedent," *i.e.*, a "but-for" cause, of an event. *Id.* at 1021.

-15-

*First*, Doe alleges that Instagram's lack of adequate identity verification procedures and other mechanisms to prevent fake accounts were a but-for cause of her trafficking and injury. Because of these defects, R.L. operated through a fake account while communicating with and trafficking Doe through Instagram. Dkt. 102 ¶¶ 14, 28, 41, 50, 70, 93-94, 145, 191. These defects therefore enabled R.L. to adopt a fake persona that he used to gain Doe's trust, to conceal his true identity, to manipulate Doe into trafficking, and to evade consequences from Meta or law enforcement. *Id.* ¶¶ 28, 41, 45-47, 50, 94, 130, 143, 145, 191. Doe's allegations support a reasonable inference that, if these defects had not existed, R.L. would not have been able to use his false identity to entrap Doe, would not have been able to make the fake account through which he trafficked Doe, and would not have been able to operate his trafficking operation under a shield of anonymity. *Id.* ¶¶ 94, 101, 143, 145, 191.

Meta suggests that these defects were not a but-for cause of Doe's injuries because R.L. did not falsely represent himself as someone she knew, masquerade as a child, or connect with Doe's acquaintances. Dkt. 105 at 16. But regardless of whether those specific circumstances exist, Instagram's defects allowed R.L. to connect with Doe through a fake account with a fake identity, which he used to manipulate her and traffic her and evade law enforcement. That R.L. did not masquerade as a child or as someone she knew changes nothing about these facts.

*Second*, Instagram's lack of adequate reporting mechanisms was a but-for cause of Doe's injuries. Because Instagram's mechanisms to report human trafficking are defective, they are ineffectual to stop human trafficking on Instagram. Dkt. 102 ¶¶ 42-43, 146. If Instagram had contained adequate reporting mechanisms, R.L.'s blatant trafficking scheme would have been reported to law enforcement so that law enforcement could take action against R.L. to prevent Doe's trafficking. *Id.* ¶¶ 95, 101, 146, 192. But because Instagram did not contain an adequate reporting mechanism—indeed, as designed,

-16-

Instagram imposed barriers that made reporting difficult—Meta did not receive a report about R.L.'s conduct that would have enabled Meta to promptly inform law enforcement. *Id.*

Meta argues that Doe has not alleged the lack of an adequate reporting mechanism caused her injury because Doe does not allege who would have reported R.L. Dkt. 105 at 17. But it is irrelevant *who* would have submitted the report. Doe's allegations support a reasonable inference that, if Instagram had included an adequate reporting mechanism, an effective report about R.L. would have been submitted. Meta also argues that Doe does not plead that the reporting would have occurred *before* R.L. contacted her. *Id.* Not true. *See* Dkt. 102 ¶¶ 101, 146, 192 (adequate reporting mechanism would have "enabled law enforcement to take action against R.L. before he had the opportunity to entrap Jane Doe").

*Third*, Meta's failure to warn Doe of the dangers of human trafficking on Instagram was a but-for cause of her injuries. Doe's allegations support a reasonable inference that, if Meta had provided proper warnings, Doe would have been on alert regarding the danger of human trafficking on Instagram, would have recognized the signs of human trafficking shown by R.L., would have heeded Meta's warnings, and would have avoided being trafficked. *Id.* ¶¶ 53, 71, 99, 102, 167, 212. But because Meta did not warn Doe, Doe did not know the danger existed, was unfamiliar with the signs of human trafficking, was unable to recognize that R.L. was grooming her for trafficking, and therefore became entrapped by R.L. *Id.* ¶¶ 15, 97, 102, 137, 161-62, 165, 167, 207, 212.

Meta argues that Doe has not pleaded causation as to Instagram's failure-to-warn defect because she has not explained how she would have used warnings to avoid being trafficked. Dkt. 105 at 17. But as just explained, the complaint states exactly that: the warnings would have allowed her to recognize the dangers and telltale signs of human trafficking exhibited by R.L., identify the risk he posed, and therefore avoid falling prey to his grooming and manipulation tactics. *See* Dkt. 102 ¶¶ 15, 53, 71, 97, 99, 102, 137, 161-62, 165, 167, 207, 212.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.    Legal causation.

The second aspect of proximate cause, the legal cause inquiry, considers limitations on liability related to the degree of connection between the conduct and the injury and public policy concerns. *State Dep't of State Hosps.*, 349 P.3d at 1022. Here, Meta raises one such purported limitation: Meta contends that R.L.'s intervening criminal conduct constitutes a "superseding cause" that breaks the chain of causation. Dkt. 105 at 17-19. But, as Meta's authority recognizes, "[i]ntervening criminal acts do not categorically bar liability." *Steinle v. United States*, 17 F.4th 819, 824 (9th Cir. 2021). Thus, the mere fact that R.L. engaged in criminal acts against Doe does not automatically absolve Meta from liability. And the involvement of one, known criminal actor in this case is very different from the attenuated chain of unclear events at issue in Meta's lead case. *See id.* at 822 (identifying six intervening events, "many of which remain unknown" and four of which were committed by unknown persons).

The superseding cause doctrine is narrow and absolves a defendant of liability only "when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." *Soule v. Gen. Motors Corp.*, 882 P.2d 298, 312 n.9 (Cal. 1994). Importantly, "what is required to be foreseeable is the general character of the event or harm…not its precise nature or manner of occurrence." *Chanda v. Fed. Home Loans Corp.*, 155 Cal. Rptr. 3d 693, 701 (Cal. Ct. App. 2013). Here, the harm that Doe suffered was not "far beyond" what Meta should have foreseen. To the contrary, this harm was easily foreseeable to Meta: Meta was well aware (and acknowledged internally) that Instagram's design facilitated sex trafficking and that sex trafficking was rampant on Instagram. *See* Dkt. 102 ¶¶ 2, 4-5, 7-12, 15, 36, 40, 46, 53, 59, 77, 92, 109-11, 143, 147, 158, 163, 166, 184, 190, 202. Therefore, this is not the type of case where the plaintiff has been subject to an unpredictable act of violence from a third party that is far outside the scope of what Meta could have imagined. Rather,

-18-

Doe's injury was the type that Meta has long known occurs regularly through Instagram. Meta cannot use R.L.'s acts of trafficking—imminently foreseeable conduct Meta knew was commonplace on Instagram—as a basis to absolve itself from liability. The erroneous application of the superseding cause doctrine to these facts would have problematic consequences for many cases arising from sex trafficking, which invariably involve the criminal acts of a sex trafficker but often implicate liability for facilitators of trafficking like social media companies and hotels.

### 2. Instagram is a product subject to products-liability claims.

Meta contends that Doe's products-liability claims fail because Instagram is not a "product" that can support such claims. Dkt. 105 at 19-21. Meta's core argument is that Instagram is not a product because it is "intangible," relying on authority stating that a product is "tangible" or "physical." *Id.* But while products are often tangible, that is not a categorical requirement. "[I]ntangible things can be products when analogized to 'tangible personal property' based on 'the context of [its] distribution and use.'" *In re Social Media*, 2023 WL 7524912, at *23; Restatement (Third) of Torts: Prod. Liab. § 19(a) (1998). In analyzing whether something is a "product," a court may also consider whether a plaintiff is complaining of a defective design (which can support a products-liability claim) or complaining about ideas and expression (which cannot). *In re Social Media*, 2023 WL 7524912, at *23-24 (collecting authorities that intangible thoughts, ideas, and expression are not "products"); *see also* Restatement (Third) of Torts: Prod. Liab. § 19, cmt. d. The court in *In re Social Media* applied these rules and considered, on a defect-by-defect basis, whether the functionalities of the defendants' social media platforms were products. 2023 WL 7524912, at *29-34. The court's analysis is instructive here.

*First*, Instagram's identity verification and fake accounts defects are properly subject to a products-liability analysis. In *In re Social Media*, the court held that defects in parental controls and age verification on social media platforms could support products-liability claims because they were

analogous to tangible personal property. *Id.* at \*29-30. The court explained that tangible products contain comparable locks or controls to prevent children from accessing them—such as parental locks on televisions that allow parents to control which channels their children can access. *Id.* at \*30. And the court observed that these defects relate to the manner in which users access the defendants' applications—such as whether their age is accurately assessed during sign-up—which are akin to complaints about user interface choices, rather than complaints about ideas or content. *Id.*

The court's analysis is equally applicable to the identity verification and fake accounts defects here. Much like age-based controls, tangible products often contain identity-based locks and controls that limit who may access the device. For example, computers are often locked down to a specific user, so a person must first establish their identity through submitting a correct username and password. And like the age-verification defect, the identity verification defect concerns access to Instagram, including whether the user's identity "is accurately assessed during the sign-up process"—a complaint about an interface choice, not content. *See id.* Thus, the identity verification defect is analogous to tangible personal property in the context of its use and distribution, and it may be properly classified as a product.[2]

*Second*, Instagram's defective reporting mechanisms are properly subject to a products liability analysis. The court in *In re Social Media* held that the design of reporting mechanisms for child sex abuse materials and adult predator accounts were "products." *Id.* at \*34. The court held that the allegations concerned the design of defendants' platforms—such as requiring users to log in to report obscene content. *Id.* The court explained this was "quintessentially a matter of design, user interface,

---

[2] Meta states in a footnote that requiring it to verify the age or identity of its users would "violate Meta's rights as a publisher, to decide whom to publish on its social-media service" and parenthetically references the First Amendment. Dkt. 105 at 21 n.6. The court should ignore this conclusory statement, which Meta fails to support with any argument that could enable a response. *See also In re Social Media*, 2023 WL 7524912, at \*17-18 (rejecting First Amendment challenge to defect claims based on inadequate age verification and reporting protocols).

1  and system architecture rather than content." *Id.* The same result follows here, where Doe makes

2  indistinguishable allegations that Instagram's reporting mechanisms are defective, including because

3  they require users to log in to report human trafficking. *See* Dkt. 102 ¶¶ 43, 95, 140, 185.

4      *Third*, Instagram's absence of adequate warnings about the dangers of human trafficking is also

5  properly subject to a products liability analysis. Manufacturers regularly print warnings on a wide

6  variety of tangible items, such as household appliances, when distributing them to customers. Thus, the

7  warning defect here is analogous to tangible personal property in the context of its use and distribution

8  and therefore raises a defect in a "product."

9

10     Meta cites certain cases that have purported to hold that social media platforms and other

11 applications do not constitute "products." Dkt. 105 at 20. But, as the court in *In re Social Media*

12 observed, many of those cases "offered minimal, if any rationale for such classifications." 2023 WL

13 7524912, at *24 & n.36 (discussing, *inter alia*, *Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586, at *4

14 (Cal. Super. Ct. Mar. 10, 2023); *Ziencik v. Snap, Inc.*, 2023 WL 2638314, at *4 (C.D. Cal. Feb. 3, 2023);

15 *Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994, 1000, 1011 (C.D. Cal. 2022)). Likewise, the court

16 explicitly distinguished its prior opinion in *Netflix* because the plaintiffs in that case premised their claim

17 on the harmful content of a television show, whereas the claims in *In re Social Media* stemmed from

18 "the design of defendants' platforms." *Id.* at *26 (discussing *Est. of B.H. v. Netflix, Inc.*, 2022 WL

19 551701, at *3 (N.D. Cal. Jan. 12, 2022)). Other cases cited by Meta do not address the issue at all, but

20 simply mention that the lower court held that the application was a product. *See Jane Doe No. 1 v. Uber*

21 *Techs., Inc.*, 294 Cal. Rptr. 3d 664, 671 (Cal. Ct. App. 2022); *In re Facebook*, 625 S.W.3d at 85 n.1.

22

23     And the product defects alleged here are different than those in *Social Media Cases*, which

24 centered on the effects of defendants' recommendation algorithms. 2023 WL 6847378 (Cal. Super. Ct.

25 Oct. 13, 2023). The court reasoned that the plaintiffs' claims were not premised on a "product" because

26

27

28
                                    -21-

the social media applications were not "static," and the experience of each user was not uniform.  *Id.* at \*14-19.  This reasoning stemmed from the fact that each user experienced the algorithms differently because the recommendations changed over time and were based on each user's usage patterns.  The court distinguished the "fluid applications of Defendants' algorithms" from product defects that would "treat[] all users in the same way."  *Id.* at \*17.  But this case involves "static" defects that treat all users in the same way.  Here, the lack of identity verification and other mechanisms to prevent fake accounts, the inadequate design of Instagram's reporting mechanisms, and the absence of warnings were static elements of Instagram's design—not "fluid" elements that each user experienced in a unique and ever-changing manner.  Thus, this Court's analysis should be guided by the more comparable defects that the court properly treated as "product" defects in *In re Social Media*.  *See* 2023 WL 7524912, at \*29-30, 34.  The court should reject a categorical rule that all electronic applications are effectively exempt from products liability law.  *See Brookes v. Lyft Inc.*, 2022 WL 19799628, at \*3-5 (Fla. Cir. Ct. Sep. 30, 2022) (holding that ride share application was a "product" subject to products liability claims, not a service).

### 3.    Meta owes Doe a legal duty that supports her negligence claims.

Finally, as to Doe's negligence claims only (counts 4-5), Meta challenges whether it owes Doe a cognizable duty of care.  Dkt. 105 at 21-25.

### a.    Doe's complaint does not rest on an affirmative duty to protect.

Meta argues that Doe seeks to impose on Meta a "duty to protect" her from third-party traffickers, and Doe cannot show that an exception to the no-duty-to-protect rule applies.  *Id.* at 22-24.  But Meta's argument begins from a false premise.  Doe is not claiming that Meta had an affirmative "duty to protect" her from third-party traffickers.  Rather, Doe claims that Meta breached its duties to exercise reasonable care in its own conduct.

*First*, Meta owes duties of care that stem from its role as the manufacturer of Instagram. "It is well-established, including in this circuit, that manufacturers of products owe…duties to users," including "the duty to design such products in a reasonably safe manner and to warn about risks they pose." *In re Social Media*, 2023 WL 7524912, at *34-35 & n.61 (citing Restatement (Third) of Torts: Prod. Liab. § 1); *see also Putensen v. Clay Adams, Inc.*, 12 Cal. App. 3d 1062, 1076-77 (Cal. Ct. App. 1970) (product manufacturer has a duty to "exercise reasonable care in the adoption of a safe plan or design" and a "duty to use reasonable care to give warning of the dangerous condition" of the product).

*Second*, Meta had a universal statutory duty to exercise ordinary care in its activities: "Everyone is responsible…for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person…." Cal. Civ. Code § 1714(a). Section 1714's general duty of care applies in any case where the defendant has created a risk of harm to the plaintiff, including when the defendant makes the plaintiff's position worse. *Brown v. USA Taekwondo*, 483 P.3d 159, 164 (Cal. 2021). Here, Meta created a risk of harm, including by making Doe's position worse, through providing her with a product rife with design and warning defects that magnified the danger and likelihood that she would be subject to sex trafficking. *See supra* at 13, 16-17.

These duties to exercise reasonable care are different from an *affirmative* duty to protect the plaintiff from a third party. In some circumstances, a defendant may have "an affirmative duty to protect the plaintiff from harm at the hands of a third party, even though the risk of harm is not of the defendant's own making." *Brown*, 483 P.3d at 164-66. But Doe's claims are not based on a theory that Meta should have taken affirmative action to protect Doe from R.L. Thus, it is irrelevant whether an affirmative "duty to protect" exists here. *See id.* at 165 n.7 ("Regardless of whether there is a basis for recognizing an affirmative duty, the no-duty-to-protect rule will not relieve the defendant of an otherwise applicable duty to exercise reasonable care when, by its own conduct, the defendant has increased the risk of harm

to the plaintiff."); *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 939-42 (Cal. 2023) (distinguishing between Section 1714's default rule of duty and a duty to protect). And the mere fact that a third-party trafficker was involved in the chain of events does not undermine Meta's own failure to use ordinary care or convert this case into a "duty to protect" case. *See Hacala v. Bird Rides, Inc.*, 306 Cal. Rptr. 3d 900, 914-16 (Cal. Ct. App. 2023) (rejecting argument that a "different set of rules" for duties to protect applied merely because a third party was part of the causal chain, and explaining that plaintiffs' negligence claims were grounded on the defendant's *own* conduct).

But even under Meta's "duty to protect" framework, Meta's actions—maximizing profits by distributing a defective product that facilitates sex trafficking—constitute "misfeasance" involving "affirmative act[s]…that create[] an undue risk of harm." Dkt. 105 at 22; *see supra* at 13-17; *In re Facebook*, 625 S.W.3d at 97-98 (characterizing Meta's conduct vis-à-vis sex trafficking as "affirmative acts"). And the court should reject Meta's contention that this framework requires a showing that sex trafficking is a *necessary component* of Meta's business—a requirement the Ninth Circuit has explicitly questioned. Dkt. 105 at 22-23; *see Doe v. Uber Techs., Inc.*, 90 F.4th 946, 950-52 (9th Cir. 2024) (expressing doubt that California Supreme Court precedent supports the "necessary component" test).

### b. The *Rowland* factors do not support creating an exception to the duties of care.

Meta also contends that it should be exempt from any applicable duty under the *Rowland* factors. Dkt. 105 at 24-25 (citing *Rowland v. Christian*, 443 P.2d 561 (Cal. 1968)). Courts consider the *Rowland* factors to determine whether to recognize an exception to an applicable duty of care. *See Brown*, 483 P.3d at 166-68. The *Rowland* factors require a court to consider:

the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community

-24-

of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

443 P.2d at 564.

The *Rowland* factors do not support creating exceptions here. The harm to Doe was imminently foreseeable. Meta was well aware that Instagram's design facilitated sex trafficking and that sex trafficking was rampant on Instagram. *See supra* at 18. Likewise, the connection between Meta's conduct and Doe's injury was close—R.L. took advantage of the defects in Instagram's product by creating a fake account to groom Doe into trafficking, and he was able to do so because Meta never warned Doe about the dangers of trafficking on Instagram. *See supra* at 16-17. There is substantial "moral blame attached to [Meta's] conduct" in knowingly profiting from sex trafficking on Instagram rather than adopting less profitable alternative designs to prevent sex trafficking. That R.L.'s actions were *also* morally blameworthy is no defense. Dkt. 105 at 24-25. And the burden to Meta of fulfilling its duties of care would have been minimal—non-defective designs were readily feasible, could have been adopted at minimal cost, and would have had a substantial effect on community safety. *See* Dkt. 102 ¶¶ 48-49, 51, 138-42, 146, 164, 185, 188, 210. Finally, imposing a duty on Meta to correct these defects would not "threaten free expression" or impose a duty to monitor content. Dkt. 105 at 24-25. Meta could have altered the design of Instagram by adopting identity verification procedures, reporting mechanisms, and warnings without altering or monitoring any third-party post on Instagram. *See supra* Part I.B. There is no basis to create an exception to the applicable duties of care here.

## **CONCLUSION**

For these reasons, Doe prays that Meta's motion to dismiss be denied. Plaintiff also prays for all other relief to which she may be entitled.

-25-

1    DATED:  August 19, 2024                    Respectfully submitted,

2                                               Amanda J. G. Walbrun
                                                CA State Bar No. 317408
3                                               BOUCHER LLP
                                                21600 Oxnard Street, Suite 600
4                                               Woodland Hills, California  91367
                                                Telephone:  (818) 340-5400
5                                               walbrun@boucher.la

6                                               Annie McAdams (*Pro Hac Vice*)
                                                ANNIE MCADAMS PC
7                                               2900 North Loop West, Suite 1130
                                                Houston, Texas 77092
8                                               Telephone: (713) 785-6262
                                                annie@mcadamspc.com
9
                                                David E. Harris (*Pro Hac Vice*)
10                                              SICO HOELSCHER HARRIS, LLP
                                                819 N. Upper Broadway
11                                              Corpus Christi, Texas 78401
                                                Telephone: (361) 653-3300
12                                              dharris@shhlaw.com

13                                               /s/    *Warren W. Harris*
                                                Warren W. Harris
14                                              BRACEWELL LLP
                                                711 Louisiana, Suite 2300
15                                              Houston, Texas  77002
                                                Telephone: (713) 221-1490
16                                              warren.harris@bracewell.com

17                                              Attorneys for Jane Doe (K.B.), Plaintiff

18

19

20

21

22

23

24

25

26

27

28

-26-

Plaintiff's Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss Third Amended Complaint
Case No. 23-CV-02387-RFL

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on the 19th of August, 2024, a copy of the above document was served on

3

all counsel of record via the Court's CM/ECF system.

4

                                    /s/   *Warren W. Harris*

5

                                    Warren W. Harris

6

7

IM-#10377202.6

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss Third Amended Complaint
Case No. 23-CV-02387-RFL